**UNITED STATES of America**

v.

**Savann SAY.**

**Cr. No. 2:95–cr–44–01.**

United States District Court,
D. Vermont.

Nov. 17, 1995.

James Michael Dingley, Bauer, Anderson & Gravel, Burlington, VT, for defendant.

Gregory Lane Waples, Office of the United States Attorney, District of Vermont, Burlington, VT, for U.S.

### MEMORANDUM OPINION

SESSIONS, District Judge.

On July 19, 1995, Defendant Savann Say pled guilty to a one-count indictment charging him with unlawful transportation of counterfeit credit cards, in violation of 15 U.S.C. § 1644(b). Following a presentence investigation, the United States Probation Office submitted a Presentence Investigation Report ("PSR") on October 12, 1995, setting forth a total offense level of 12, a criminal history category of I, and a sentencing range of 10 to 16 months.

Say objected to portions of the PSR. The Government did not object to the PSR. The Government and Say filed sentencing memoranda prior to a hearing on the disputed portions of the PSR, held on November 8, 1995. Findings were announced and sentence imposed from the bench following the hearing. The Court indicated its intention to supplement its findings with a written opinion. This opinion sets forth the Court's findings regarding the disputed portions of the presentence report, and the basis for the sentence imposed.

### I. *Facts*

On May 6, 1995, Savann Say, a Canadian citizen, was a passenger in a rented car which entered the United States from Canada at the Highgate Springs, Vermont port of entry. The driver, Raduy Mom, stated that he was traveling to his home in Lowell, Massachusetts. He explained that Say was getting a ride with him to nearby Lawrence,

Massachusetts to pick up Say's car, which had broken down during an earlier trip.

During a search of the car, customs inspectors seized 17 Visa credit cards, which had been secreted between layers of tissue inside an opened and re-glued facial tissue box. None of the cards were signed. Several of the cards were issued in one name. Subsequent investigation revealed that the cards were counterfeit, but the numbers were authentic credit card numbers issued to Visa customers of the Canadian Bank of Imperial Commerce. The combined available credit on the cards totalled $115,578 (Canadian), or $80,904 (U.S.). Fingerprint analysis revealed the presence of latent prints on the cards, but none of the prints matched those of the Defendant.

Say, aged 21, was born in Cambodia. Many of his family died at the hands of the Khmer Rouge. With the remainder of his family, he spent years in a refugee camp in Vietnam. His father died there, reportedly of starvation. He emigrated to Canada in 1989. He now lives in Montreal with his mother and brother. He works 60 hours a week at a local restaurant. He has no prior criminal record.

In his presentence interview with the United States Probation Office, Say admitted that he knew that the cards were either stolen or forged. He said that his only role in the offense was to transport the cards over the border. He refused to identify any other individuals involved in the offense, for fear of endangering his life.

The Presentence Investigation Report set Say's base offense level at 6, pursuant to U.S.S.G. § 2F1.1(a). It added a six level enhancement for a loss exceeding $70,000, but less than $120,000, according to U.S.S.G. § 2F1.1(b)(1)(G), and a 2 level enhancement for an offense involving more than minimal planning or a scheme to defraud more than one victim, according to U.S.S.G. § 2F1.1(b)(2). Two levels were subtracted for acceptance of responsibility, to result in a total offense level of 12. With a criminal history category of I, the PSI recommended

a guideline imprisonment range of 10 to 16 months.

Say objected to the calculation of the amount of loss under U.S.S.G. § 2F1.1(b)(1). In the alternative, he contended that downward departure was warranted because the calculation of loss overstated the seriousness of the offense. *See* U.S.S.G. § 2F1.1, Application Note 10. He objected to the characterization of the offense as having involved more than minimal planning under U.S.S.G. § 2F1.1(b)(2)(A). He claimed that he should receive a decrease in his offense level pursuant to U.S.S.G. § 3B1.2(a), based on his minimal role in the criminal activity. He further urged that the Court depart downward from the guideline range in his case for mitigating circumstances not adequately taken into consideration by the Sentencing Commission, under U.S.S.G. § 5K2.0.

## II. *Discussion*

### A. Calculation of loss

■ According to the Commentary which accompanies U.S.S.G. § 2F1.1 and § 2B1.1 [1], the calculation of loss involving credit cards must be at least $100 per card. U.S.S.G. § 2B1.1, Application Note 4. If the actual loss is greater than $100 per card, then the actual loss figure must be used. *Id.;* U.S.S.G. § 2F1.1, Application Note 7 (loss is the value of the money, property, or services unlawfully taken). If an intended loss that the defendant was attempting to inflict can be determined, the intended loss figure will be used if it is greater than the actual loss. U.S.S.G. § 2B1.1, Application Note 7.

In this case, no actual loss occurred, because the counterfeit cards were seized before they were used. The issue is whether, on the facts presented in this case, an intended loss can be determined.

Because an offense level enhancement is sought, the Government bears the burden of proving by a preponderance of the evidence that Say attempted to inflict a loss totalling the aggregate credit limit of the cards.

---

1. The Commentary to § 2F1.1 directs me to refer to the Commentary to § 2B1.1 for valuation of loss. U.S.S.G. § 2F1.1, Application Note 7.

*United States v. Streich,* 987 F.2d 104 (2d Cir.1993); *United States v. Butler,* 970 F.2d 1017 (2d Cir.), *cert. denied* 506 U.S. 980, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992).

The Government argued that Say by his guilty plea admitted he transported the cards with fraudulent intent, that Say's conduct appeared to be part of a larger counterfeiting scheme, and that the purpose of counterfeiting credit cards with genuine account numbers is to obtain access to the credit limits of the accounts. These factors, it urged, were a sufficient basis upon which to find that Say intended to and attempted to inflict a loss to the aggregate limits of the credit card accounts.

This Court could find no decisions from this Circuit which adopted the aggregate credit limit as the measure of intended loss in credit card fraud cases. Two decisions from other Circuits, however, have approved calculation of intended loss from theft or fraudulent use of credit cards by aggregating the credit limits of the cards.

In *United States v. Egemonye,* 62 F.3d 425 (1st Cir.1995), the defendant pled guilty to a multi-count indictment charging conspiracy and other offenses involving credit card fraud. The case arose out of a sting operation, in which the defendant was supplied on three separate occasions with quantities of credit cards. Following these transactions, the defendant created false driver's licenses in the credit card names, and obtained cash advances from some of the cards at or near the credit limit. On the fourth occasion, the defendant was arrested.

At sentencing, the district court increased the base offense level by 8 additional levels, attributing to Egemonye an intended loss of over $200,000, representing the aggregate credit limit of all of the cards obtained in the four transactions. The judge found that Egemonye was capable of and intended to use the cards to secure amounts at or virtually at their aggregate limits.

In *United States v. Sowels,* 998 F.2d 249 (5th Cir.1993), *cert. denied* — U.S. ——, 114 S.Ct. 1076, 127 L.Ed.2d 393 (1994), the defendant postal employee pled guilty to theft of mail. He stole 110 credit cards, but was apprehended before he could use them. The combined credit limits on the cards totalled $315,600. Sowels stipulated that he had stolen credit cards from the mail on a previous occasion in 1991. Investigation revealed that over $28,000 in unauthorized charges on 15 of those previously stolen cards were made during a seven day period. At sentencing, the district court increased the base offense level by 11, determining that the offense involved a loss of more than $350,000. The judge found that Sowel's method of operation, which included selling or giving away some of the credit cards to others, combined with the use of the credit cards in the past, supported a finding that the intended loss was the aggregate credit limit.

These cases demonstrate that where a sentencing court has facts upon which to base findings that a defendant was capable of and intended to use the cards to secure amounts at or near their credit limits, aggregating the credit limits of the cards to calculate loss is appropriate. Thus, in *Egemonye* there was evidence that the defendant instructed runners to procure cash at or near the credit limits of the cards, and that he arranged to deposit stolen checks into the accounts to refresh their limits. A pattern was established of using as many cards as he could get to obtain cash at or near the limits of the cards. The First Circuit held this to be "good evidence of actual intent and some prospect of success," sufficient to sustain the sentencing court's findings. And in *Sowels* there was evidence of the defendant's method of operation, plus his fraudulent use of stolen credit cards in the past.

■ This Court need not determine intended loss with precision, but only make a reasonable estimate of the loss, given the available information. *United States v. Deutsch,* 987 F.2d 878 (2d Cir.1993). Although approximation is permitted, speculation is not, however. *Id.* I cannot find, based upon the available information, that Say intended and attempted to inflict a loss of over $70,000 by his actions. The dearth of information as to the origin or intended fate of the credit cards in this case, or as to Say's knowledge of or role in a larger counterfeit-

ing scheme, especially when contrasted with the substantial amount of information available to the sentencing judges in the *Sowels* and *Egemonye* cases, compels me to the conclusion that attributing intended loss to this defendant would be based upon speculation.

I find that the Government has failed to sustain its burden for an enhancement of the base offense level based on intended loss under U.S.S.G. § 2F1.1(b)(1). There is no actual loss. Accordingly, I have applied the minimum loss calculation for offenses involving credit cards of $100 per card, for a total loss of $1,700. Under U.S.S.G. § 2F1.1(b)(1)(A), there is no increase to the base offense level.

■ I note, alternatively, that had I been able to find a loss of more than $70,000 on these facts, I would have granted a four level downward departure on the basis that the loss overstated the seriousness of the offense. The same guideline range would have applied. Since Say's offense level has not been enhanced based on the amount of loss, Say's request for a downward departure on this basis is denied.

### B. Other Specific Offense Characteristics

■ U.S.S.G. § 2F1.1(b)(2) provides for a two level increase in the base offense level if the offense involved more than minimal planning, or a scheme to defraud more than one victim. Say objected to the PSI's finding that the offense involved more than minimal planning. At sentencing he also argued that the Government had failed to show a scheme to defraud more than one victim.

"More than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense ... fashioning a special device to conceal the property ... would constitute more than minimal planning.

U.S.S.G. § 1B1.1, Application Note 1(f). Such planning is an offense characteristic, not a characteristic of the individual defendant. *United States v. Rosa,* 17 F.3d 1531 (2d Cir.), *cert. denied* — U.S. ——, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994).

■ Say's conduct involved more than minimal planning. Based on the evidence and arguments at sentencing, I find that Say attempted to conceal the counterfeit cards from customs inspectors by obtaining a box of tissues, carefully opening one end of the box, secreting the cards between layers of tissue, and then resealing the box end with adhesive. Although admittedly not a sophisticated device for concealment according to the customs inspector, it nevertheless constitutes a special device as that term is used in the Guidelines Commentary.

■ Say argued that because there was no evidence of his intent to use the cards, there was insufficient evidence of a scheme to defraud more than one victim.

"Scheme to defraud more than one victim," ... refers to a design or plan to obtain something of value from more than one person. In this context, "victim" refers to the person or entity from which the funds are to come directly.

U.S.S.G. § 2F1.1, Application Note 3. The offense involved 17 counterfeit credit cards, bearing genuine account numbers. Undoubtedly, the cards would have been used to obtain cash advances, or goods and services, from a variety of financial institutions or commercial establishments.

I find that the offense involved 1) more than minimal planning, and 2) a scheme to defraud more than one victim; accordingly the offense level is increased by 2 levels.

### C. Mitigating role

■ U.S.S.G. § 3B1.2 permits the Court to decrease the offense level by 4 levels if the defendant was a minimal participant in any criminal activity, by 2 levels if the defendant was a minor participant in any criminal activity, and by 3 levels if the conduct fell in between minimal and minor participation. The Introductory Commentary to the guidelines that cover Role in the Offense indicates that the determination of a defendant's role in the offense is to be made on the basis of all conduct included within the scope of Relevant Conduct under U.S.S.G. § 1B1.3. Relevant conduct includes

(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or wilfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . .

U.S.S.G. § 1B1.3(a)(1). Although the existence of a larger criminal undertaking can reasonably be deduced from the available facts, there is no evidence that Say undertook the criminal activity in concert with others, such that all reasonably foreseeable acts of others in furtherance of the jointly undertaken criminal activity could be attributed to him.

Neither party has challenged the scope of relevant conduct presented in the PSI, which confined its discussion of the offense to the transportation of the counterfeit credit cards. Since Say himself performed all of the acts comprising the elements of the offense for which he was convicted, and there are no additional uncharged acts or omissions attributable to him as relevant conduct, I find that Say is not entitled to a decrease in his offense level for minimal or minor role under U.S.S.G. § 3B1.2.[2]

**D. Downward departure under U.S.S.G. § 5K2.0**

Say urged three grounds for departure under U.S.S.G. § 5K2.0: 1) the amount of loss in the PSI overstated the seriousness of the conduct; 2) the collateral consequences of his felony plea, his excludability from the United States in future, have already inflicted upon him extraordinary and severe punishment in light of his desire to become a United States citizen; 3) because of his small size and a disabling language barrier, incarceration would pose a safety issue.

Say's first ground for departure has been discussed in section A, above. Regarding Say's second ground for departure, this Court notes that the Second Circuit has not foreclosed alienage as grounds for downward departure, in the appropriate case. *United States v. Restrepo,* 999 F.2d 640 (2d Cir.), *cert. denied* —— U.S. ——, 114 S.Ct. 405, 126 L.Ed.2d 352 (1993). Relying upon this decision, this Court has recently approved a one level downward departure for a Canadian citizen where his alien status was the sole factor making him ineligible for a non-incarceratory sentence. *United States v. Simalavong,* 924 F.Supp. 610 (D.Vt.1995).

Because of the resolution of the other sentencing factors in dispute, which renders Say eligible for a sentence of probation, I find it unnecessary to reach the merits of his request for downward departure, either on the grounds of extraordinary collateral consequences due to Say's alienage, or of extraordinary vulnerability in prison. On the basis of the information supplied to me, I would have given serious consideration to Say's request for downward departure.

**III.  *Sentence Calculation***

Say's base offense level is 6. U.S.S.G. § 2F1.1(a). Two levels are added because the offense involved more than minimal planning or a scheme to defraud more than one victim. U.S.S.G. § 2F1.1(b)(2). Two levels are subtracted because Say has demonstrated acceptance of responsibility for his offense. U.S.S.G. § 3E1.1(a). There is no adjustment to the offense level for amount of loss or role in the offense. Say's total offense level is 6. According to the Guidelines, a defendant in Criminal History Category I with an offense level of 6 faces a sentencing range under the Guidelines of 0 to 6 months. A sentence of probation is authorized. U.S.S.G. § 5B1.1(a).

---

**2.** Had jointly undertaken criminal activity been proven, this Court would have increased Say's base offense level by 6 levels for the amount of loss, but decreased it by 3 levels for an incom-plete conspiracy under U.S.S.G. § 2X1.1(b), and further decreased it by a mitigating role in the offense under § 3B1.2.