MEMORANDUM
 

 DALZELL, District Judge.
 

 A jury convicted defendant Jan Kaezmarski and two co-defendants of,
 
 inter alia,
 
 bank fraud in violation of 18 U.S.C. § 1344. After a sentencing hearing this day, this Memorandum will explain in some detail how we resolved the contested sentencing issue of the amount of “loss” pursuant to U.S.S.G. § 2Fl.l(b)(l).
 

 I.
 
 Factual
 
 Background
 
 [1]
 

 Robert Sroka was arrested in April, 1995, in connection with a series of bank frauds and shortly thereafter began cooperating with the Government in an attempt to reduce the sentence he faced. As part of his plea agreement with the Government, Sroka promised to assist in the investigation of other crimes. To this end, Sroka solicited defendant Jan Kaczmarski in June, 1995, to
 
 *1178
 
 commit a not particularly esoteric type of bank fraud. Sroka testified that he selected Kaczmarski because they had before succeeded in exactly the same type of bank fraud together. Unbeknownst to Kaczmarski and the other defendants, Sroka taped virtually all of his conversations with them.
 
 [2]
 

 The plan called for Kaczmarski to recruit someone to produce fraudulent identification documents for the purpose of opening bank accounts in Philadelphia. Sroka testified that they targeted Philadelphia banks because all that is needed to open an account in that City is a valid Social Security number that has actually been issued by the Social Security Administration and a picture identification in the same name as the Social Security card. By contrast, in New York City and elsewhere, banks require several more identification documents. For his part, Sroka agreed to obtain stolen checks from the mail for deposit and procure the Social Security cards. Once the checks had been deposited, the same individual who opened the accounts was supposed to withdraw all of the money on deposit.
 

 To advance their plan, Kaczmarski recruited defendant Andrzej Sliwowski to procure the false identification and defendant Zdzislaw Rusznica (a/k/a “Mr. Ziggy”) to open the accounts. Like Sroka, Kaczmarski, Sliwowski and Rusznica are all Polish nationals. Sroka introduced to the group State Department Agent Robert Bradley, who was working undercover, to provide a validly-issued Social Security card in the unlikely name of Patrick McDonnell. Exh. 21. Sliwowski then altered a Polish (not Irish) passport using the Patrick McDonnell name and Rusznica’s photograph. Exh. 22. With the Social Security card and doctored passport in hand, Rusznica opened bank accounts at both CoreStates and Mellon Banks in Philadelphia in August, 1995.
 

 Once the accounts had been opened, the plan called for Sroka to deposit stolen checks into them via an automated teller machine. After the checks had cleared, Rusznica was to enter each bank and withdraw in increments all of the money on deposit. Sroka, however, did not actually have a supply of stolen checks, although the FBI created the illusion that he did. The banks, in cooperation with the FBI, issued deposit slips that made it appear as if Sroka had deposited a total of $104,520 in checks into the accounts, even though, in fact, no money was actually deposited into either account. All together, Sroka “deposited” three checks totalling $48,-200 into CoreStates and another three checks totalling $56,320 into Mellon. Exhs. 23-28.
 

 On September 15, 1995, the defendants, Sroka, and Bradley drove to Philadelphia intending to withdraw $9,800 from CoreStates and an additional $8,600 from Mellon. The defendants drove first to a CoreStates branch where Rusznica presented for payment a check for $9,800 made out to “Cash” drawn on the FBI-controlled accounts. Exh. 33. Federal officials closed in and arrested the defendants on the spot.
 

 II.
 
 Legal Analysis
 

 A.
 
 Amount of “Loss”
 

 Pursuant to U.S.S.G. § 2Fl.l(b)(l), the fraud guidelines are driven by the amount of “loss” to the victims attributable to the defendants.
 
 United States v. Coyle,
 
 63 F.3d 1239, 1250 (3d Cir.1995). The base offense level for a fraud crime is six, but that level is enhanced depending on the amount of “loss” the fraud caused.
 

 The Government claims that the loss in Kaczmarski’s case was $104,520, arguing that he intended to withdraw all of the money said to be on account at the banks and would have done so if he had not been apprehended first. The Government therefore argues for a six-level specific offense characteristic enhancement. U.S.S.G. § 2Fl.l(b)(l)(G).
 

 Kaczmarski and his co-defendants,
 
 [3]
 
 not surprisingly, disagree. They contend that the enhancement should be limited, at most,
 
 *1179
 
 to two levels pursuant to § 2Fl.l(b)(l)(C) because the loss was only $9,800,
 
 ie.,
 
 the amount of the check that Rusznica presented to CoreStates for payment. At the antipode, the loss was zero, so the argument goes, because there was no possibility of any true “loss” because it was the fiction of a sting operation.
 

 “Loss” is defined in the application notes to § 2F1.1 as “the value of the money, property, or services unlawfully taken.” U.S.S.G. § 2F1.1, Application Note 7. This application note also refers the reader to the commentary to § 2B1.1, the guideline for larceny, embezzlement, and theft.
 
 Id.
 
 “The Commentary to § 2B1.1 emphasizes the
 
 amount taken
 
 from the victims as the primary measure of loss.”
 
 United States v. Maurello,
 
 76 F.3d 1304, 1309 (3d Cir.1996) (emphasis in original). Although the fraud guideline’s explicit cross-reference to the theft guidelines “suggests that the same measurement of loss — amount taken — should be used in both cases”, our Court of Appeals has refused to impose the identical loss valuation analysis for both crimes in all cases.
 
 Id.
 
 (citing
 
 United States v. Kopp,
 
 951 F.2d 521, 529 (3d Cir.1991)).
 

 More specifically, in fraud cases, ‘loss’ is, in the first instance, the amount of money the victim has actually lost (estimated at the time of sentencing), not the potential loss as measured at the time of the crime.
 
 [4]
 
 However, the ‘loss’ should be revised upward to the loss that the defendant intended to inflict, if that amount is higher than actual loss.
 

 Kopp,
 
 951 F.2d at 536 (footnote added). In applying
 
 Kopp’s
 
 “flexible, fact-driven concept of loss”,
 
 United States v. Dickler,
 
 64 F.3d 818, 825 (3d Cir.1995), we need not determine the loss with mathematical “precision” so long as we make a “reasonable estimate of the loss, given the available information.” U.S.S.G. § 2F1.1, Application Note 8.
 
 [5]
 

 There is no question here that Mellon and CoreStates did not suffer any “actual loss”. Indeed, it was impossible for there to have been any actual loss in this sting operation for the simple reason that there was never any money on deposit in the accounts to lose. Some courts have held that the “loss” under § 2F1.1 is zero when there is no realistic possibility of actual economic loss including, as here, in Government sting operations.
 
 See, e.y., United States v. Galbraith,
 
 20 F.3d 1054, 1059 (10th Cir.) (in sting operations, “the loss subjectively intended by a defendant should not control Svhen the economic reality is that the probable or actual loss could not in any circumstances have exceeded a discernible lesser amount.’”) (citation omitted),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 233, 130 L.Ed.2d 157 (1994);
 
 United States v. Watkins,
 
 994 F.2d 1192, 1196 (6th Cir.1993) (“A second limitation on the broad reach of the ‘intended loss’ rule is that the intended loss must have been possible to be deemed relevant. Regardless of the defendant’s intent, the defendant may not be sentenced on the basis of harm that he or she was incapable of inflicting.”) (citations omitted);
 
 cf. United States v. Schneider,
 
 930 F.2d 555, 559 (7th Cir.1991) (Posner, J.) (The “estimate of the loss” must bear “relation to economic reality”).
 

 Although there is little question that applying
 
 Kopp
 
 and its progeny to Kaezmarski’s case raises genuine metaphysical difficulties,
 
 [6]
 
 there can be no question that Kaezmarski himself intended to withdraw all of the approximately $100,000 on account at both Mel-
 
 *1180
 
 Ion and CoreStates Banks. For example, on September 12, 1995, three days before Rusznica attempted the withdrawal in Philadelphia, Kaezmarski questioned Sroka on the amount that they would be able to withdraw from the accounts:
 

 Kaezmarski: How much will you withdraw? 100,000?
 

 Sroka: It’s on two checks. On two books. 100,000. 56 is on Mellon, and 48 is on the ... on Corestate
 
 [sic
 
 ].
 

 Kaezmarski: That’s enough for now. You won’t be able to withdraw any more.
 

 Exh. 18 at 2. It will be noted that Kaezmarski mentions the $100,00 sum, not Sroka. Indeed, the testimony depicts other instances of Kaezmarski talking up the scope of the intended fraud.
 
 See, e.g.,
 
 Exh. 16 at 2, quoted below at p. 15.
 

 We hold, accordingly, that Kaezmarski intended to cause a “loss” to Mellon and CoreStates of $104,520, and thus an upward enhancement of six offense levels is warranted.
 

 B.
 
 Sentencing Factor Manipulation
 

 Although he does not use this locution, Kaezmarski also raises the troubling issue of sentencing factor manipulation. “Sentencing factor manipulation occurs when the government engages in improper conduct that has the effect of increasing a defendant’s sentence.”
 
 United States v. Okey,
 
 47 F.3d 238, 240 (7th Cir.1995). The issue has most often been raised in drug eases in which an undercover agent convinces a defendant to buy or sell a greater quantity of drugs than the defendant intended.
 

 Kaezmarski argues that it is unfair to impose a specific offense characteristic enhancement based on a “loss” of $104,520 when that amount was entirely within the control of the Government’s cooperating witness and its agents. In other words, although the Government limited the potential amount of “loss” to $104,520 here, this arbitrary figure should not control the defendant’s sentence, so the argument goes, when the Government could just as easily have put $104.52, or $1,045,200, or any other amount “into” the account.
 

 Decisions from other Circuits distinguish between sentencing factor manipulation, which “occurs when the government engages in improper conduct that has the effect of increasing a defendant’s sentence” and sentencing entrapment, “which occurs when the Government improperly causes a defendant initially predisposed to commit a lesser crime
 
 (e.g.,
 
 sell a smaller quantity of drugs or produce less counterfeit money) to commit a more serious offense.”
 
 Okey,
 
 47 F.3d at 240 & n. 3. We believe Kaczmarski’s argument is, in essence, sentencing factor manipulation and not sentencing entrapment because the Government did not induce him to commit a different, more serious offense (say, if Congress had made it a separate crime to commit fraud in excess of $100,000), but instead controlled the amount of “loss” within the same offense (18 U.S.C. § 1344). This distinction has been termed “significant” by some courts because sentencing entrapment is not a defense if a person has a predisposition to commit the greater offense, while sentencing factor manipulation may be.
 
 United States v. Jones,
 
 18 F.3d 1145, 1153 (4th Cir.1994). In any event, it is unclear how important this difference is as a practical matter since it appears that both theories have to date been rarely upheld.
 
 Id.
 
 at 1154 (“Indeed, no case has been cited to us in which the application of either theory has been upheld, and we are aware of no such case.”).
 

 Some courts have described sentencing manipulation as “outrageous government conduct that offends due process [and] could justify a reduced sentence.”
 
 Jones,
 
 18 F.3d at 1153 (footnote and citation omitted). The “outrageous government conduct” variant of the sentencing factor manipulation theory originated from dicta in
 
 United States v. Russell,
 
 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), although several Circuits and three members of the Supreme Court, including then-Justice Rehnquist, the author of
 
 Russell,
 
 have since rejected it.
 
 Hampton v. United States,
 
 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976);
 
 Okey,
 
 47 F.3d at 240 n. 2;
 
 United States v. Tucker,
 
 28 F.3d 1420, 1422-23 (6th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995).
 
 *1181
 
 Other courts have held that sentencing manipulation need not arise to the level of a constitutional violation in order to be a viable sentencing factor.
 
 See, e.g., United States v. Egemonye,
 
 62 F.3d 425, 427 (1st Cir.1995) (“While something less than a constitutional violation might suffice, as extraordinary misconduct, Egemonye’s reference to due process concepts is certainly in the ballpark”). Because Kaczmarski does not allege that the Government acted “outrageously”, we shall concern ourselves only with this non-constitutional variant of sentencing factor manipulation.
 

 Our Court of Appeals has not addressed whether the sentencing factor manipulation doctrine, or its close cousin, sentencing entrapment, is a viable one.
 
 United States v. Raven,
 
 39 F.3d 428, 438 (3d Cir.1994) (“We have not as yet had occasion to address the theory of sentencing entrapment described in
 
 [U.S. v.] Rogers
 
 [982 F.2d 1241 (8th Cir. 1993) ] and
 
 [U.S. v.] Lenfesty,
 
 [923 F.2d 1293 (8th Cir.1991) ], and we do not do so today____”). The Seventh and Eleventh Circuits have rejected the doctrine outright as a matter of law.
 
 United States v. Garcia,
 
 79 F.3d 74, 76 (7th Cir.1996) (“We now hold that there is no defense of sentencing manipulation in this Circuit.”),
 
 petition for cert. filed,
 
 No. 95-9454 (U.S. June 20, 1996);
 
 United States v. Williams,
 
 954 F.2d 668, 673 (11th Cir.1992) (“First, as a matter of law, we reject Duke’s sentence entrapment theory.”). The Fourth Circuit has distinguished between sentencing entrapment and sentencing factor manipulation and expressed “skepticism” about the latter theory.
 
 Jones,
 
 18 F.3d at 1154;
 
 see, also, United States v. Walls,
 
 70 F.3d 1323, 1329-30 (D.C.Cir.1995),
 
 cert. denied sub nom., Campbell v. U.S.,
 
 — U.S. -, 116 S.Ct. 1445, 134 L.Ed.2d 565 (1996). Other Circuits have held that sentencing factor manipulation is a viable defense, but have found the doctrine inapplicable based on the specific facts of the cases before them.
 
 See, e.g., United States v. Stavig,
 
 80 F.3d 1241, 1245 & n. 3 (8th Cir.1996);
 
 United States v. Rosa,
 
 17 F.3d 1531, 1551 (2d Cir.),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994);
 
 United States v. Bara,
 
 13 F.3d 1418, 1420 (10th Cir.),
 
 cert. denied,
 
 — U.S. -, 114 S.Ct. 1662, 128 L.Ed.2d 378 (1994);
 
 United States v. Brewster,
 
 1 F.3d 51, 55 (1st Cir.1993);
 
 United States v. Barth,
 
 990 F.2d 422, 424-25 (8th Cir.1993);
 
 United States v. Rogers,
 
 982 F.2d 1241, 1245 (8th Cir.),
 
 cert. denied sub nom., Philipp v. United States,
 
 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 706 (1993);
 
 United States v. Calva,
 
 979 F.2d 119, 122-23 (8th Cir.1992);
 
 United States v. Connell,
 
 960 F.2d 191, 196 (1st Cir.1992).
 

 Because of the lack of guidance on this issue from our Court of Appeals, we ordered the parties to address the propriety of adopting the standard the First Circuit enunciated in Judge Boudin’s opinion in
 
 United States v. Egemonye,
 
 62 F.3d 425 (1st Cir.1995), namely, “ Vhere government agents have
 
 improperly
 
 enlarged the scope or scale of the crime,’ the sentencing court has power to exclude ‘the tainted transaction’ from the guideline computations and for purposes of any mandatory minimum statute.”
 
 Id.
 
 at 427 (quoting
 
 United States v. Montoya,
 
 62 F.3d 1, 3 (1st Cir.1995) (emphasis in
 
 Montoya)).
 
 Both
 
 Egemonye
 
 and
 
 Montoya
 
 (also authored by Judge Boudin) recognize that a defendant must demonstrate that the Government engaged in “extraordinary misconduct” in order to be entitled to a reduction in sentence.
 
 Egemonye,
 
 62 F.3d at 427;
 
 Montoya,
 
 62 F.3d at 4.
 

 In its thoughtful analysis of this problem, the Government has advised “that it may be appropriate for the sentencing courts in this district to adopt part of the reasoning of the First Circuit.” Government’s Memorandum of Law Regarding Sentencing Factor Manipulation at 2. Quoting
 
 Koon v. United States,
 
 - U.S. -, -, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996), the Government argues that a sentencing factor manipulation departure should only occur “in an extreme case where the conduct ‘is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present.’ ”
 
 Id. at
 
 4. The Government emphatically disagrees with Judge Boudin’s suggestion for the First Circuit that “something less than a constitutional violation might suffice.”
 
 Id.
 
 at 5, citing
 
 Egemonye,
 
 62 F.3d at 427. The Government criticizes the First Circuit’s “supplementary
 
 *1182
 
 doctrine”, analogous to common law defenses such as entrapment, “because it ignores that the fact that [sic] sentencing is controlled completely by the Federal Sentencing Guidelines, applicable statutes, and the Constitution.”
 
 Id.
 
 at 6.
 

 By contrast, Kaczmarski continues vigorously to press his zero “loss” argument by inviting us to follow the reasoning of the Tenth Circuit in
 
 United States v. Galbraith,
 
 20 F.3d 1054 (10th Cir.1994).
 
 See
 
 Defendant John KaczmarsM’s Sentencing Memorandum at 3. With echoes from impossibility jurisprudence, the Tenth Circuit held that “[b]eeause this was an undercover sting operation which was structured to sell stock to a pension fund that did not exist, defendant could not have occasioned any loss even if the scheme had been completed.”
 
 Id.
 
 at 1059 (footnote omitted).
 

 After considering the parties’ views both in their memoranda and at the hearing today, we believe Judge Boudin’s non-constitutional approach has much to commend it.
 
 [7]
 
 The first of these attractive features is fundamental fairness. The Government in sting operations has it within its power to set the scope of the criminality. Unless the defendant evinces an objective intention to alter that scope, it opens the door to injustice to grant the Government a blank check on a defendant’s sentencing fate by allowing it to create the “loss”.
 

 This concern for fundamental fairness is buttressed by a second reason in favor of Judge Boudin’s approach. In the present Guidelines regime, sentences are directly driven by amounts of loss and quantity of drugs.
 
 See
 
 U.S.S.G. §§ 2Fl.l(b)(l) and 2Dl.l(c). Since we are unaware of any evidence of Congressional intent under the Sentencing Reform Act
 
 completely
 
 to transfer sentencing decisions to the Government, it simply will not do for sentencing judges effectually to cede the scope of loss or quantity to the authors of successful stings.
 

 Lastly, the greatest advantage of Judge Boudin’s approach is that it introduces a limiting principle. The law tolerates the moral compromise of sting operations because of the protection of the entrapment defense. The essence of that defense, of course, is a defendant’s predisposition to commit the crime at issue.
 
 See, e.g., Jacobson v. United States,
 
 503 U.S. 540, 549-54, 112 S.Ct. 1535, 1541-43, 118 L.Ed.2d 174 (1992). If, as here, a jury has by its verdict found the requisite predisposition, the Government will always have little difficulty showing an unlimited predisposition for criminal gain. Avarice is rarely bounded, and criminals offered a choice between more or less will very likely choose more. Absent Judge Boudin’s rule there would be no meaningful limit on the Government to manipulate a defendant’s greed and thus his sentence.
 

 We conclude, however, that with respect to Kaczmarski the Government did not engage in “extraordinary misconduct” or “improperly enlarged the scope or scale of the crime.” If anything, the evidence on the tapes demonstrates that Sroka (and through him the Government) was conservative in his (and its) fraud plans, and that it was
 
 Kaczmarski,
 
 and not the Government, who upped the ante:
 

 Sroka: Well, just today I met with Bob [Bradley], you understand? And he has 2 checks ... one for 16,300 and 14,200.
 

 Kaczmarski: (unintelligible)
 

 Sroka: Well, we’ll put them in one by one, here and here, right? What do you think? Will it be enough?
 

 Kaczmarski: Well, for now it should be enough ...
 

 Sroka: Not too little ... not too much?
 

 Kaczmarski:
 
 Too little ...
 

 
 *1183
 
 Sroka: Too little?
 

 Kaczmarski: Then one more time ... one of each....
 

 Exh. 16 at 2 (emphasis added).
 

 The ultimate economic scope of this fraud was thus unambiguously enlarged at Kaczmarski’s, not Sroka’s, insistence. He is therefore not a defendant who should receive the leniency sentencing factor manipulation might win for a less greedy participant.
 

 We therefore have applied the $104,520 loss to our calculus of Kaczmarski’s sentence.
 
 [8]
 

 ORDER
 

 AND NOW, this 15th day of August, 1996, upon consideration of the parties’ memoranda and after a hearing this day, and in accordance with the accompanying Memorandum, it is hereby ORDERED that defendant’s objections to ¶ 42 of the Presentence Investigation Report (August 6, 1996 rev.) are OVERRULED.
 

 [1]
 

 . We shall rehearse only those facts necessary to the resolution of this issue, which are largely uncontested because at trial defendants raised the entrapment defense instead of challenging whether these events took place. We instructed the jury on entrapment, but the jury nevertheless convicted all defendants.
 

 [2]
 

 . Because these conversations were, for the most part, conducted in the Polish language, English translations were prepared and the transcripts were read into the record at the trial by actors playing the roles of the various participants. Those transcripts each became the Government exhibits cited in this memorandum.
 

 [3]
 

 . All defendants have advised us of their views on this point.
 

 [4]
 

 . Because the amount of “loss” here would be no different at the time of sentencing than it was when the crime was
 
 committed
 
 — e.g., because a post-fraud, pre-sentencing recovery reduces the realized loss in fact — we need not decide whether we must apply
 
 United States v. Shaffer,
 
 35 F.3d 110 (3d Cir.1994) (amount of loss in check kiting scheme must be calculated as of the time the crime was committed, not at the time of sentencing).
 

 [5]
 

 . Alternatively, the "loss” could be calculated as the offender’s gross gain as a result of the fraud if we were unable to estimate the loss, intended or actual, to the victims. U.S.S.G. § 2F1.1, comment. (n. 8);
 
 United States v. Dickler,
 
 64 F.3d 818, (3d Cir.1995);
 
 United States v. Badaracco,
 
 954 F.2d 928, 938 (3d Cir.1992). This alternative formulation would not apply here as the defendants did not profit from their scheme.
 

 [6]
 

 .
 
 Bui see, United States v. Holloman,
 
 981 F.2d 690, 693 (3d Cir.1992),
 
 cert. denied
 
 509 U.S. 907, 113 S.Ct. 3002, 125 L.Ed.2d 695 (1993) (applying § 2F1.1 to a sting operation).
 

 [7]
 

 . We quickly dispose of the Government’s objection that the Boudin approach ignores the legal reality "that sentencing is controlled completely by the Federal Sentencing Guidelines, applicable statutes, and the Constitution.” Our enterprise here is nothing more than construction of the Guidelines, first in construing the vaporous word
 
 loss
 
 and second in determining when to take the voyage the Sentencing Commission specifically offers in Application Note 10 to § 2F1.1
 
 (i.e.,
 
 downward departure may be warranted when "the loss determined under subsection (b)(1) ... overstate^] the seriousness of the offense”).
 

 With respect to Kaczmarski's reliance on
 
 Galbraith,
 
 we find the impossibility approach to be excessively formalistic.
 
 Galbraith
 
 also proves too much in that its effect is to drive every fraud or drug sting to the base offense level. We therefore find
 
 Galbraith
 
 unpersuasive.
 

 [8]
 

 . As suggested in n. 7, there is an alternative basis for departing downward on the amount of "loss”. The Commentary to § 2F1.1 provides that a downward departure may be warranted when "[i]n a few instances, the loss determined under subsection (b)(1) ... overstate[s] the seriousness of the offense.” U.S.S.G. § 2F1.1, Application Note 10. As an example, the Sentencing Commission cites the situation where a defendant attempts to negotiate an instrument that is so obviously fraudulent that no one would seriously consider honoring it.
 
 Id.
 
 From the foregoing analysis, however, it is clear that Kaczmarski's case does not present one of these "few instances” the Sentencing Commission had in mind.