UNITED STATES of America

v.

Angela NOLAN–COOPER.

Criminal Action No. 95–435–01.

United States District Court,
E.D. Pennsylvania.

March 11, 1997.

David M. Howard, Dechert, Price and Rhoads, Philadelphia, PA, for Defendant.

Angela Nolan–Cooper, Philadelphia, PA, pro se.

Terri A. Marinari, U.S. Attorney's Office, Philadelphia, PA, for U.S.

## MEMORANDUM

ROBRENO, District Judge.

## I. INTRODUCTION

Angela Nolan–Cooper stands before the Court for sentencing having pled guilty to: 1) one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and 18 U.S.C. § 1956(a)(3)(B) (Count 3); 2) ten counts of money laundering to conceal or disguise the source or ownership of property represented to be proceeds of specified unlawful activity and aiding and abetting, in violation of 18 U.S.C. § 1956(a)(3)(B) and 18 U.S.C. § 2 (Counts 11, 13 to 18, 20, 27 and 28); 3) one count of conspiracy to structure or assist in structuring any transaction with one or more domestic financial institutions, in violation of 18 U.S.C. § 371 and 31 U.S.C. § 5324(a)(3) (Count 29); and 4) one count of criminal forfeiture pursuant to 18 U.S.C. § 982(a)(1) (Count 32).

Pursuant to a plea agreement, the government has moved to dismiss counts one, two,

four, five, six, seven, eight, nine, ten, twenty-two and thirty-one of the superseding indictment. These counts include drug charges, as well as other charges of structuring, money laundering and criminal forfeiture.

Also in the plea agreement, the government and the defendant stipulated to a guideline range of 41 to 51 months of incarceration (this range is based on an offense level of 22). In the presentence investigation ("PSI") report, the probation officer calculates the offense level to be 26 which, based upon Ms. Nolan–Cooper's criminal history level of I, would subject the defendant to a sentence of 63 to 78 months.

The defendant has raised objections to the PSI report's recommendation for upward adjustments based on the defendant's use of her special skill as a lawyer and obstruction of justice. She also objects to the failure of the PSI report to recommend an additional one level downward adjustment for acceptance of responsibility.[1] Additionally, the defendant moves for a downward departure on the grounds of outrageous government conduct and sentencing factor manipulation. For the reasons discussed below, the defendant's objections are overruled and her motion for downward departure is denied.

## II. FACTUAL BACKGROUND [2]

The Internal Revenue Service ("IRS") received information from a confidential informant that Ms. Nolan–Cooper, a Philadelphia lawyer, was assisting others to launder funds received through the sale of drugs and other illegal activities. The IRS arranged for Ms. Nolan–Cooper to be introduced to IRS Special Agent Louis Oubre. Agent Oubre, acting in an undercover capacity, posed as "Louis A. Richard," a drug dealer from the New Orleans area, who had significant drug proceeds that he wished to make look legitimate. The introduction of Ms. Nolan–Cooper to Agent Oubre in his undercover capacity took place at a hotel near the Philadelphia Airport on February 7, 1994. This meeting was arranged and attended by one Oswald McBride, an acquaintance of Ms. Nolan–Cooper, who unbeknownst to Ms. Nolan–Cooper had turned Government informant.

Ms. Nolan–Cooper attended the meeting with the understanding that "Mr. Richard" (hereafter referred to as Agent Oubre in his undercover capacity), had some business dealings to discuss with her. She quickly learned that the business Agent Oubre wanted to discuss was how to make illegitimate money look legitimate. Tr. of Feb. 7, 1994 Meeting at 1–2. During that first meeting, Ms. Nolan–Cooper also learned that Agent Oubre was a drug dealer and that the money he was seeking to launder was the proceeds from illegal drug sales. *Id.* at 29, 32.[3]

At the outset, Ms. Nolan–Cooper suggested that she could help Agent Oubre make his money look legitimate in two ways: 1) by

1. Other objections the defendant has raised are: 1) the use of the terms "fraudulent business" and "sham business" in the PSI report when referring to the business Ms. Nolan–Cooper incorporated for the undercover agent to launder money through; 2) allegedly misleading paragraphs concerning Ms. Nolan–Cooper's role in and remuneration for the sale of a car from Ben Goff to the undercover agent which was illegally titled under a fictitious name; and 3) the failure of the probation officer to include a paragraph describing the Court's findings that the undercover agent engaged in sexual relations with the defendant on February 18, 1995. The Court finds these objections to be meritless.

2. The Court has reviewed the following pleadings and material: 1) the presentence investigation report prepared by the probation officer; 2) the guilty plea agreement between defendant and the government; 3) the government's guilty plea memorandum; 4) the government's sentencing memorandum; 5) the defendant's sentencing memorandum and motion for downward departure; 6) notes of testimony from the pretrial hearing (Sept. 5, 6, 9, 10, 12 & 13, 1996); 7) the transcript of the oral argument and the Court's findings of fact and conclusions of law (Oct. 4, 1996); and 8) transcripts of the recordings made during the undercover operation.

3. Agent Oubre discussed with Ms. Nolan Cooper that his money came from drugs twice during the initial meeting. "I'm sure if they dug hard enough, and just tried to look at me, you know, somebody must have to say something.... They'll link me to drugs." *Id.* at 28–29. "I want to enjoy it [the money] now.... and right now I can't because as soon as I come out ... as soon as I show somebody twenty-five thousand dollars, they are gonna know it's from drugs." *Id.* at 32. To which Ms. Nolan Cooper responded: "Well, they're gonna assume it's from drugs, but if you can show that it's from another source ..." *Id.*

setting up a sham business for him; and 2) by hiding his money in accounts in the Bahamas. *Id.* at 1–2.[4] She explained to the agent why he should, and how he could hide his money in the Bahamas, what procedures he would use, what precautions he would have to take, and how he could get his money back from the Bahamas. *Id.* at 2–9.[5] She then discussed the advantages of forming a corporation and running his money through a business to make it look legitimate by showing a source of income and filing tax returns. *Id.* at 9–12. After she told the agent about these options, Agent Oubre asked Ms. Nolan–Cooper, "So you could help me do all of these things?" Her answer was, "Um hmm." *Id.* at 12.

She further assured the agent that she was ready, willing and able to help him legitimize his purported ill-gotten gains, "trust me, I have plenty of clients ... and it's the same situation you have.... And there's nothing on 'em for years." *Id.* at 13–14. At the end of the first meeting, she again assured Agent Oubre, "the way I do it, I'm ... not gonna make any mistakes." *Id.* at 37. When the agent asked her, "Well, how soon ... can we start," Ms. Nolan–Cooper replied, "Right away." *Id.* at 29.

Ms. Nolan–Cooper also suggested that, rather than start his own business, Agent Oubre could "invest in a business already established here" which, she said, is run by "someone who's in a very similar situation with you" who "has a recording studio ... in Jersey." *Id.* at 19–20. While the business itself may not be profitable, "even in losing the money ... it's helped [the person doing the money laundering] to legitimize everything else." *Id.* at 20. She also acknowledged that she helps this person hide his money in the Bahamas. "[H]e's another person that I'm back and forth. I do the same thing with him." *Id.* The evidence bears out that the person to whom Ms. Nolan–Cooper was referring was codefendant Ester Carter, who also stands convicted of money laundering in connection with this case.

Ms. Nolan–Cooper touted the advantages of the music business because "you create your own records.... you can ... show on paper ... that you generated ... eight hundred and fifty thousand dollars in five months.... In studio time. And nobody's ever been in the studio ... they can't ever check that.... So this is income. This is legitimate income." *Id.* at 21. She explains that this is possible because the agent could "make up" a rap group and say they spent several thousand dollars at the studio and there would be "no way that the IRS can trace those people." *Id.* at 22. As the first meeting was concluding, Ms. Nolan–Cooper offered to take the agent to look at the studio the following day. *Id.* at 36.

The second meeting took place only two days later. Agent Oubre told Ms. Nolan–Cooper that he wanted to start his own corporation first, instead of investing in the existing business. Tr. of Feb. 9, 1994 Meeting at 10, 12. He told her that he did like

---

4. Just after the introductions, the conversation went as follows:

> L.R.: What has OZZIE told you about me so far?
> A.C.: That you were ... you had some business in that ... that you wanted to discuss.
>
> . . . . .
>
> L.R.: ... I'll just start from the beginning. Why we're here. Uh ... I got a lot of cash.
> A.C.: Um hmm.
> L.R.: ... I need to get it to look legitimate.
> A.C.: So you want to set up a business?
> L.R.: I don't know.... OZZIE told me you could help me with some ideas.
> A.C.: ... there's several things you could do.
> L.R.: Uh huh.
> A.C.: I mean, you could take it someplace and hide it.
> L.R.: Uh huh.

> A.C.: ... other clients that I have ... they put money away in other places, like in the Bahamas.

*Id.* at 1–2 (L.R. refers to Agent Oubre in his undercover capacity as Louis Richard. A.C. refers to defendant Angela Nolan–Cooper.).

5. She later explained to him the process of structuring transactions to avoid IRS reporting requirements. When Agent Oubre asked Ms. Nolan–Cooper if she could get bank checks for him right away so he could move around more easily (because he liked to carry fifteen to twenty-thousand dollars with him), she said "you'd have to do it over a period of time.... because under the law, you can't deposit more than a certain amount of cash without filing a certain form with the bank.... you can't deposit more than ten thousand dollars in cash.... without filing the form that goes directly to the IRS." *Id.* at 24–26.

the idea of starting a corporation in the music business. *Id.* at 12–13. Ms. Nolan–Cooper said that to look legitimate, Agent Oubre's business would need an office. She volunteered to set Agent Oubre up with office space at the New Jersey studio. *Id.* at 13, 35. She told Agent Oubre that once the corporation is incorporated, he can "set up a corporate bank account," "pay rent for a couple of months" and then "start making intermittent deposits" and "start to build the account up." *Id.* at 16–17. She also told him that she could use her attorney escrow account to help him funnel his money into his "legitimate" business account, or into his Bahamian account. *Id.* at 17–19.[6]

Agent Oubre and Ms. Nolan–Cooper met for a third time on March 11, 1994. At that meeting they agreed to set up a corporation entitled "LAR Productions, Inc." as a purported music production, promotion and recording company. Tr. of Mar. 11, 1994 Meeting at 2–4, 26–27. Agent Oubre gave Ms. Nolan–Cooper twelve thousand dollars to open the corporate bank account. *Id.* at 41. She then introduced Agent Oubre to Mr. Carter by phone so that Agent Oubre could rent office space for LAR Productions at Mr. Carter's music studio. *Id.* at 43–45. She told Agent Oubre that he should furnish the office with a phone, fax, computer, desk and pictures, and that she could help him do that. *Id.* at 29. She told him that he could prepare vouchers with names of fictitious aspiring recording artists to make it appear as though the money going into the business account was coming from legitimate musical production work, which would be untraceable. *Id.* at 31. She explained to Agent Oubre that he would have to pay taxes on the money he ran through the production company and that she "w[ould] set [him] up with an accountant." *Id.* at 38. At this meeting, Agent Oubre also paid Ms. Nolan–Cooper $5,000 as a retainer. *Id.* at 21. Subsequent to the meeting, Ms. Nolan–Cooper incorporated

"LAR Productions, Inc.," opened a bank account and provided Agent Oubre with a corporate seal.

On May 10, 1994, Ms. Nolan–Cooper took Agent Oubre to Mr. Carter's recording studio in New Jersey. Agent Oubre expressly told Mr. Carter that his money came from drugs and that Ms. Nolan–Cooper was helping him make it look legitimate. Tr. of May 10, 1994 Meeting at 147. On September 29, 1994, Agent Oubre paid Mr. Carter $6,615 for six months rent and one month security deposit for an office at the recording studio. On December 19, 1994, a lease, backdated to July 1, 1994, was drafted by Ms. Nolan–Cooper. Mr. Carter and Agent Oubre both signed the backdated lease. On February 1, 1995, Agent Oubre paid Mr. Carter $955 for the January rent. The space rented by Agent Oubre remained unoccupied throughout the conspiracy.

Agent Oubre also gave Ms. Nolan–Cooper $42,000 in cash to launder through the LAR Productions account on May 10. She told him she could not do it all at once but would do it slowly. She subsequently made several deposits from her attorney escrow account into the account of LAR Productions ($5,000 on May 11, 1994, $5,000 on August 10, 1994, $22,500 on September 29, 1994, and $8,000 on December 20, 1994).

Also on May 10, 1994, Ms. Nolan–Cooper told Agent Oubre that she could get him an American Express credit card through her law firm, falsely listing him as an investigator employed by her firm. As promised, she sent Agent Oubre the American Express card on June 13, 1994. Agent Oubre used the card on numerous occasions and reimbursed Ms. Nolan–Cooper for the charges.

Although the actual transaction took place much later, May 10 was also the day that Ms. Nolan–Cooper told Agent Oubre that he could obtain a car from one of her clients,

---

**6.** Ms. Nolan–Cooper explained to Agent Oubre:

[O]ne thing ... I can do for you as an attorney, is that all of my funds in my escrow account ... they really can't trace them ... they can trace 'em but they don't question 'em like they do somebody's personal account.... So that's a resource. I mean, I don't like to hold money there for a long time ... but I can pass money

through that.... Keep them [the deposits] small and slow.... up to like ten, twelve thousand a month.... You can do it that way, and then start to funnel the money, you know, if you want it to go in the bank here.... Or, if you want it to go in the bank down there [the Bahamas].

*Id.* at 17–19.

Benjamin Goff. Agent Oubre later spoke to Mr. Goff directly on several occasions, telling Mr. Goff that his money came from drugs and that he wanted the car titled in someone else's name, and giving him the specifications for the car including hidden compartments to transport drugs. On February 7, 1995, Ms. Nolan–Cooper arranged to have Agent Oubre deliver $34,000 to her for the purchase of the car from Mr. Goff. On February 15, 1995 Ms. Nolan–Cooper gave Mr. Goff a check from her attorney escrow account to pay for the car. Mr. Goff deposited the check into his own account. He then paid $28,128 for the car on February 17, 1995 using a treasurer's check and a cashier's check. The car was titled under the fictitious name "Darryl Young," and delivered to Agent Oubre. Mr. Goff and Ms. Nolan–Cooper divided the difference between the $34,000 Agent Oubre had paid for the car and the purchase price of $28,128.

On December 19, 1994, Agent Oubre gave Ms. Nolan–Cooper $85,000 to transfer into an account in the Cayman Islands. He told her he needed to get the money there to consummate a drug deal. Agent Oubre paid Ms. Nolan–Cooper $8,490 to perform the wire transfer. She enlisted codefendants Darnell Greene, Stephen Henderson and Warren Mikell to assist her in structuring this transaction to avoid detection.[7] She and the three others each deposited $21,250 (one fourth of Agent Oubre's $85,000) in accounts under their own names. On December 29, 1994 each wired $21,250 from their accounts to an account in the Cayman Islands.

On December 19, 1994, Ms. Nolan–Cooper brought Carl Ellis, an accountant and a former client of Ms. Nolan–Cooper, into the conspiracy. At the first meeting between Mr. Ellis and Agent Oubre, and in the present of Ms. Nolan–Cooper, Agent Oubre told Mr. Ellis that he had a large amount of cash that came from drugs. Ms. Nolan–Cooper told Mr. Ellis that $50,000 dollars of drug proceeds had been deposited into LAR Production's bank account. Mr. Ellis agreed to prepare both a business plan and a corporate tax return which would falsely indicate that the money had come from a loan. That day, Agent Oubre gave Mr. Ellis a $500 retainer fee. Mr. Ellis met with Agent Oubre and Ms. Nolan–Cooper again on February 1, 1995. He advised them of various ways to disguise the source of the cash deposited into LAR Production's account and discussed filing false tax returns and financial statements for the corporation. He received an additional $400 retainer at this time.

The total amount involved in the money laundering scheme to which Ms. Nolan–Cooper has pled guilty is $192,772. The evidence is overwhelming that Ms. Nolan–Cooper's criminal conduct in this case was pervasive and entirely voluntary. From the first meeting with Agent Oubre, Ms. Nolan–Cooper planned the scheme to launder the proceeds of drug activities, recruited coconspirators, counselled Agent Oubre as to how to execute the scheme, and then personally undertook to effectuate the objectives of the conspiracy.

Since the time of her arraignment in October 1995, and through oral arguments on the pretrial hearing in October 1996, Ms. Nolan–Cooper has contended that this prosecution should be dismissed because of three alleged sexual encounters between her and Agent Oubre. Ms. Nolan–Cooper asserts that the conduct of Agent Oubre in this case constitutes outrageous government conduct. After a six day hearing and oral argument, the Court found that the first two sexual encounters alleged had not occurred but that the third sexual encounter, near the end of the investigation and after Ms. Nolan–Cooper had committed her criminal conduct, had occurred. The Court concluded, however, that Agent Oubre's conduct under the circumstances of this case did not rise to the level of outrageousness constituting a due process violation.[8] *See infra* section III.B.1 (discuss-

---

7. Mr. Henderson and Mr. Mikell were indicted as co-conspirators but the charges were subsequently dropped.

8. The defense of outrageous government conduct was spawned by dicta in the case of *United States v. Russell*, 411 U.S. 423, 431, 93 S.Ct. 1637,

1642, 36 L.Ed.2d 366 (1973), where the Court commented: "We may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the Government from invoking judicial process to obtain a conviction." *Russell*, 411 U.S. at 431–32, 93

ing the defendant's motion for downward departure based on the claim of alleged outrageous government conduct).

## III. SENTENCING ISSUES [9]

### A. *Guideline Calculations*

#### 1. *Offense Level Calculations*

According to the PSI report, the base offense level for a violation of 18 U.S.C. § 1956(h) is 20. U.S.S.G. § 2S1.1. All the offenses are grouped under the highest offense level, pursuant to U.S.S.G. § 3D1.2(d), because the offense level for all Ms. Nolan–Cooper's offenses is determined largely by the amount of harm or loss.

Under specific offense characteristics, three levels are added because the defendant knew or believed the funds to be the proceeds of drug sales. U.S.S.G. § 2S1.1(b)(1). The defendant raises no objection to these calculations.

In accordance with U.S.S.G. § 2S1.1(b)(2), the probation officer increased the offense level by one because the amount of money laundered was over 100,000 (in the plea agreement the government and the defendant stipulated that the range of money laun-

dered was between $100,000 and $200,000). The defendant does not specifically object to this additional level but requested that the probation officer report: 1) the amount Ms. Nolan–Cooper actually received for the services she performed for the agent; 2) that the agent set the amount he paid her; 3) that the government set the amount stipulated to; and 4) that the agent told Ms. Nolan–Cooper that he wanted his money laundered so that he could retire from the drug business. PSI Objection 2. Furthermore, as discussed below, Ms. Nolan–Cooper is seeking a downward departure based on the contention that the government controlled the amount of money which was to be laundered. Therefore, under the PSI, and before any adjustments are made, the offense level for Ms. Nolan–Cooper is 24.

#### 2. *Adjustments*

##### a. *Adjustment for Role in the Offense*

The probation officer increased the offense level by two in accordance with U.S.S.G. § 3B1.3 [10] because Ms. Nolan–Cooper used her special skills as a lawyer to assist the agent in laundering his purported drug proceeds.[11] Ms. Nolan–Cooper objects to this

---

S.Ct. at 1643. The Supreme Court considered this defense after finding that the defendant could not invoke the defense of entrapment because he clearly showed a predisposition for the crime which therefore barred him from using the entrapment defense. *Id.*

In 1978, the Third Circuit applied the doctrine of outrageous government conduct to dismiss a conviction on due process grounds. *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978). While it has not so applied the doctrine since, the Third Circuit has continued to utilize its reasoning. *See, e.g., United States v. Jannotti,* 673 F.2d 578 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), 469 U.S. 880, 105 S.Ct. 243, 244, 83 L.Ed.2d 182 (1984); *United States v. Voigt,* 89 F.3d 1050, 1070 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996). For a discussion of the Court's decision denying the defendant's motion to dismiss the indictment, see Hearing Tr. of Oct. 4, 1996 at 80–106.

**9.** The balance of this memorandum represents a slightly edited version of the Court's decision delivered from the bench at sentencing.

**10.** U.S.S.G. § 3B1.3 provides:
If the defendant abused a position of public or private trust, or used a special skill, in a man-

ner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.... If this adjustment is based upon an abuse of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

**11.** The probation officer did not consider an adjustment under U.S.S.G. § 3B1.1, which would add four levels based on the defendant's aggravating role as "an organizer or leader of a criminal activity that involved five or more participants." U.S.S.G. § 3B1.1(a). Nor did the government, consistent with the plea agreement, recommend such an adjustment. While the Court will not occasion delay in the sentencing by injecting *sua sponte* the possibility of the adjustment in the sentencing calculus, the Court ponders why such an adjustment was not considered by the probation officer. *See United States v. Bass,* 54 F.3d 125 (3d Cir.1995).

Application Note 4 to this section lists as "[f]actors the court should consider [for a leadership role] ... the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accom-

adjustment because she alleges that she did not use any sophisticated legal skill in helping the agent, rather she acted more in the capacity of a business manager (incorporating LAR Productions, setting up bank accounts, renting office space, getting furniture, hiring an accountant, purchasing an automobile, transferring funds by wire, etc.). Def.Sent.Mem. at 11–12; PSI Objection 7.[12]

Application Note 2 to U.S.S.G. § 3B1.3 states " '[s]pecial skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." An adjustment for use of special skills " 'applies to persons who abuse their special skills to facilitate significantly the commission or concealment of a crime.' " *United States v. Maurello*, 76 F.3d 1304, 1314 (3d Cir.1996) (quoting Background to U.S.S.G. § 3B1.3).

Therefore, before imposing an upward adjustment on Ms. Nolan–Cooper for use of a special skill pursuant to U.S.S.G. § 3B1.3, the Court must find "(1) that [Ms. Nolan–Cooper] possesses a special skill; and (2) that [she] used it to significantly facilitate the commission or concealment of [her] offense." *Id.* (citing *United States v. Hickman*, 991 F.2d 1110, 1112 (3d Cir.1993)).

■ Clearly, Ms. Nolan–Cooper used her lawyering special skills in several ways to facilitate the commission and concealment of her offense. In itself, the use of her attorney escrow account to funnel money for the agent significantly facilitated concealment of the offense. Moreover, the Court agrees with the probation officer that Ms. Nolan–Cooper used her legal knowledge of the tax laws to structure financial transactions to avoid detection, and used her knowledge of the Bahamian laws that certain funds deposited in Bahamian financial institutions are free from disclosure to the United States government.

The defendant's argument that her skills were general business skills, ones akin to those of a business manager and not the special skills possessed solely by lawyers, is disingenuous. As the Third Circuit has held "including defendant's experiences and general knowledge acquired over the course [her] legal career within the contours of [her] special skills is warranted." *Id.* (citing, *inter alia, United States v. White*, 972 F.2d 590, 600–01 (5th Cir.1992), *cert. denied sub nom., Wilson v. United States*, 507 U.S. 1007, 113 S.Ct. 1651, 123 L.Ed.2d 272 (1993) (finding use of a special skill where a defense attorney specializing in drug cases used knowledge acquired as a prosecutor and defense lawyer to avoid surveillance during drug conspiracy activities)).

Here, Ms. Nolan–Cooper had received formal training, and had experience incorporating businesses and drafting leases. Her experience in the Bahamas had also lead her to acquire knowledge of tax and banking laws which she utilized in the money laundering scheme to avoid detection. The Court concludes that Ms. Nolan–Cooper possessed special skills and used these skills to significantly facilitate the offense. Therefore, an adjustment for the use of her special skills is appropriate.

b. *Adjustment for Obstruction of Justice*

The probation officer adjusted the offense level upward two levels for obstruction of justice in accordance with U.S.S.G. § 3C1.1 [13]

---

plices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

Here, Ms. Nolan–Cooper had decision making authority, was the primary participant in the offense, recruited numerous accomplices, and exercised considerable control and authority over at least five others. Under these circumstances, while a two level adjustment for her use of a special skill is certainly appropriate, a four level increase as an organizer or a leader appears to be more in line with the defendant's role in the offense.

**12.** In the plea agreement, the government agreed not to comment on any adjustment for use of special skill.

**13.** U.S.S.G. § 3C1.1 provides:

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by **2** levels. Application Note 3 to this section lists examples of conduct that this enhancement would apply to, including "(b) committing, suborning, or attempting to suborn perjury."

because Ms. Nolan–Cooper perjured herself during the Court's hearing on her motion to dismiss on the due process ground of outrageous government conduct. Ms. Nolan–Cooper testified that she and Agent Oubre had engaged in sexual relations on three occasions. The Court found that sexual relations had occurred on only one occasion, near the end of the investigation, and after Ms. Nolan–Cooper had largely completed her criminal conduct.

The Supreme Court has stated that when "a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice ... under the perjury definition we have set out." *United States v. Dunnigan,* 507 U.S. 87, 95, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993). In *Dunnigan,* the Supreme Court relied on the statutory definition of perjury at section 1621 of title 18 of the United States Code, which states that "[a] witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan,* 507 U.S. at 94, 113 S.Ct. at 1116.

Ms. Nolan–Cooper objects to the obstruction of justice adjustment because the Court did not make a specific finding that she had perjured herself. She also contends that the subject of her allegedly perjured testimony was not material. PSI Objection 6; Def. Sent.Mem. at 12–13.[14]

### i. *The Court Finds that Ms. Nolan–Cooper Gave False Testimony at the Pretrial Hearing*

The Court has reviewed the transcript and its findings from the pretrial hearing, and concludes that Ms. Nolan–Cooper willfully provided false testimony regarding her accusations that sexual relations occurred between her and Agent Oubre in August and December of 1994.

After a six day hearing, the Court found that during the approximately thirteen months of the investigation, Agent Oubre, made several trips to the Philadelphia area to meet with Ms. Nolan–Cooper. While in Philadelphia, Agent Oubre played the role of a wealthy drug dealer who stayed in expensive rooms at the city's best hotels, rented fancy cars and bought expensive dinners and liquor.

During the investigation, Agent Oubre escorted Ms. Nolan–Cooper to dinner on several occasions. These social occasions were generally initiated by Agent Oubre. However, Ms. Nolan–Cooper accepted Agent Oubre's invitations without hesitation. Often these social outings were attended by other individuals, some whom were coconspirators recruited by Ms. Nolan–Cooper to facilitate the illegal objectives of the money laundering scheme.

These evenings frequently consisted of dinner and drinks at some of the finest restaurants in the Philadelphia area, and, on several occasions, the partying continued late into the evening at some of the area's nightclubs. These nights out on the town were paid for by Agent Oubre with funds supplied to him by the government, often costing upwards of several hundred dollars per night.

Ms. Nolan–Cooper testified that on the early morning of August 13, 1994, she and Agent Oubre had sexual relations in Agent Oubre's room at the Omni Hotel in Philadelphia. Ms. Nolan–Cooper stated that after going out to several nightclubs with Agent Oubre, co-defendant Darnell Greene and another female, she and the agent returned to his room at the Omni Hotel at approximately 4:00 a.m. Ms. Nolan–Cooper claimed that she stayed in Agent Oubre's room for about an hour, during which time she engaged in sexual relations with him. Agent Oubre denied this allegation.

At the hearing, Ms. Nolan–Cooper called two witnesses, ostensibly to corroborate her allegations. Raymond Jawers, a friend of Ms. Nolan–Cooper, said that he saw her at the Black Banana nightclub with a man

---

**14.** Pursuant to the plea agreement, the government does not comment on the applicability of this adjustment.

roughly fitting the description of Agent Oubre who had his arm around her and was kissing her. Flora Pauling, also a friend of Ms. Nolan–Cooper, testified that she saw Ms. Nolan–Cooper driving towards her home between 6:15 a.m. and 7:30 a.m. the next morning, roughly at the time it would have been had Ms. Nolan–Cooper stayed an hour in Agent Oubre's room. Neither witness, however, had personal knowledge of whether Ms. Nolan–Cooper was with Agent Oubre in Agent Oubre's room during the time alleged.

Three government surveillance agents [15] who were posted outside the hotel throughout the evening testified that they saw Agent Oubre, Ms. Nolan–Cooper, Mr. Greene and his companion arrive at the hotel at approximately 4:00 a.m. The agents testified that Mr. Greene and his companion left from the hotel almost immediately and that Agent Oubre and Ms. Nolan–Cooper talked outside the hotel for approximately five minutes. Ms. Nolan–Cooper then left in her car and Agent Oubre went into the hotel, according to the agents.

The three agents also testified that they went to Agent Oubre's room, after about ten minutes, and debriefed him. The debriefing was reportedly completed by approximately 4:30 a.m. when they left Agent Oubre alone in the hotel. This testimony was uncontradicted. The Court credited the testimony of the three IRS agents who were on surveillance that night and found that Agent Oubre and Ms. Nolan–Cooper did not have the opportunity to be alone in Agent Oubre's room as testified to by Ms. Nolan–Cooper. Therefore, the Court found that Ms. Nolan–Cooper and Agent Oubre could not have engaged in sexual relations on the early morning of August 13, 1994, as claimed by Ms. Nolan–Cooper.

Ms. Nolan–Cooper also testified that on the early morning of December 17, 1994, she and Agent Oubre again engaged in sexual relations. She stated that she and Agent Oubre went to several nightclubs alone and returned to the Omni Hotel at approximately 2:00 a.m.

Ms. Nolan–Cooper testified that after returning to the Omni Hotel, she told Agent Oubre that her car needed gas and asked the agent to follow her in his car to a Mobil station a few blocks from the hotel. After Ms. Nolan–Cooper had obtained gas at the station, Ms. Nolan–Cooper testified, Agent Oubre asked her back to his room. She asserted that once they were back in the agent's room, the two engaged in sexual relations. Agent Oubre denied this allegation.

Agent Dollard, who was on surveillance that evening with several other agents, testified that he observed Agent Oubre and Ms. Nolan–Cooper return to the hotel at approximately 2:00 a.m. and then observed Ms. Nolan–Cooper leave in her car followed by Agent Oubre in his car.[16] Agent Dollard said he then went to his nearby office and placed a call to Agent Oubre's pager. Agent Oubre promptly returned his page using his cellular phone and told Agent Dollard he would meet him back at the hotel in approximately five minutes. Ms. Nolan–Cooper corroborated that Agent Oubre was on the phone while she was at the gas station.

Additionally, Agent Oubre's telephone records show a twelve minute phone call to Agent Dollard's office at approximately the time Agent Dollard had indicated. Agent Dollard testified that he, accompanied by Customs Agent Walt Michalewjik, met Agent Oubre back at the hotel about five minutes later. Agents Oubre, Dollard and Michalewjik then proceeded to Pat's Steak House in South Philadelphia for cheese steaks and

---

15. The three IRS agents assigned to surveillance who testified regarding the events of the August 12 and 13 are Agent John Lafferty, Agent Kelvin Bowser, and Agent Robert Walker.

16. Agent Walker testified that he was on surveillance that evening with Agent Dollard. He confirmed Agent Dollard's testimony that the agents had observed Agent Oubre and Angela Nolan–Cooper arrive at the hotel at approximately 2:00 a.m. He thereafter left, at Agent Dollard's di-

rection. The agents had been alerted by Agent Oubre that hotel employees had warned him that he might be under investigation by police because he was frequently followed by several men after returning to the hotel. Out of concern for Agent Oubre's cover, Agent Dollard ordered Agent Walker and another agent to return home while he and Customs Agent Michalewjik (phonetic) debriefed Agent Oubre.

then returned to the hotel to discuss the investigation.

The Court credited the testimony of Agent Dollard and found that Agent Oubre and Ms. Nolan–Cooper did not have the opportunity to be alone in Agent Oubre's room. Therefore, the Court found that Ms. Nolan–Cooper and Agent Oubre could not have engaged in sexual relations in the early morning of December 17, 1994, as claimed by Ms. Nolan–Cooper.[17]

In light of these findings, the Court concludes that Ms. Nolan–Cooper's statements constituted false testimony provided willfully. The Court notes that three witnesses corroborated Agent Oubre's testimony regarding the early morning of August 13, and one witness and a subsequent recorded telephone conversation with Ms. Nolan–Cooper corroborated his testimony regarding the early morning of December 17. Ms. Nolan–Cooper's testimony, to the contrary, therefore, could not have been the "result of confusion, mistake, or faulty memory," *Dunnigan,* 507 U.S. at 94, 113 S.Ct. at 1116. As in *Dunnigan,* there were "numerous witnesses who contradicted [the defendant] regarding so many facts on which she could not have been mistaken, [that] there is ample support for the District Court's finding [of perjury]." *Id.* at 95–96, 113 S.Ct. at 1117. *See also United States v. Bethancourt,* 65 F.3d 1074, 1078 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1032, 134 L.Ed.2d 109 (1996) (upholding an adjustment for obstruction of justice where the trial court had concluded that the government agents had testified truthfully and the defendant had not, after the defendant testified at trial that he was handcuffed and threatened during an interrogation which led to his confession while the interrogating agents testified that the defendant was neither handcuffed nor threatened).

#### ii. *The Perjured Statements Were Material*

The defendant argues that in order for her statements to be considered perjury they must have been material. In support of her argument, the defendant points out that the criminal statute covering perjury requires that the perjured statement must concern a "material matter." 18 U.S.C. § 1621(1).[18] The defendant also cites Application Note 5 to U.S.S.G. § 3C1.1 which states " '[m]aterial evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." *See also Dunnigan,* 507 U.S. at 94, 113 S.Ct. at 1116. The Supreme Court has held that a statement is "material if it 'has a natural tendency to influence, or was capable of influencing, the decision of' the decision-making body to which it was addressed." *Kungys v. United States,* 485 U.S. 759, 770, 108 S.Ct. 1537, 1546, 99 L.Ed.2d 839 (1988).[19]

The defendant contends that her statements alleging that she and Agent Oubre engaged in sexual relations in August and

---

17. The Court's finding was supported by a recorded phone conversation the following day between Agent Oubre and Ms. Nolan–Cooper disclosing that Agent Oubre stated to Ms. Nolan–Cooper "After I left you, I was coming back here and I said hey, I want to get me a cheese steak." The Court took into account the defendant's argument that Agent Oubre's memorandum of daily activities for that night failed to note that he met with Agent Dollard and Agent Michalewjik after the conclusion of the assignment that night. The Court found that the absence of a notation concerning these activities constituted a scrivener's error, an oversight on the part of Agent Oubre that did not materially affect the Court's conclusion.

18. 18 U.S.C. § 1621 provides:
Whoever—
(1) having taken an oath before a competent tribunal, officer, or person, in any case in

which the law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true . . .

. . . . .

is guilty of perjury. . . .

19. In *Kungys,* the Supreme Court considered an appeal of a revocation of citizenship based on appellant's material misrepresentations to immigration officials in violation of 8 U.S.C. § 1451(a). The Court noted that it was adopting the same definition of material used for other statutes, including criminal perjury prosecutions under 18 U.S.C. § 1621.

December, 1994 were not material to the determination of whether her due process rights were violated. The defendant claims this is so because, while the Court found that sexual relations did occur between Ms. Nolan–Cooper and Agent Oubre in February, 1995, the Court concluded that these sexual relations did not violate due process. *See infra* section III.B.1. The inference the defendant apparently wishes the Court to draw is that, since the Court found one incident of sexual relations was not a violation of due process, three incidents would not be either.

The defendant's argument is misguided. The Court did indeed find that the agent had sexual relations with Ms. Nolan–Cooper and that the sexual relations did not violate her due process rights. The Court, however, noted that the sexual relations occurred on only one occasion, at the end of the investigation, after Ms. Nolan–Cooper's criminal conduct was nearly completed, and was the result of a rogue agent purposely misleading his supervisors. It was under those specific circumstances that the Court concluded that the one incident of sexual relations did not rise to the level of a due process violation. Whether sexual contact between a defendant and an undercover agent would rise to the level of outrageous government conduct under different circumstances is, of course, not before the Court at this time. *See United States v. Cuervelo*, 949 F.2d 559 (2d Cir. 1991).[20] In fact, it may well have been the realization of the legal importance of placing the sexual encounters with Agent Oubre at an earlier point, in the middle of the investigation, and not simply at the end, which animated Ms. Nolan–Cooper's perjurious testimony.

Nor does the Court agree that the defendant's testimony was not material to the outcome of the case. It is clear that Ms. Nolan–Cooper's assertions that sexual relations occurred in August and December (i.e. that they had occurred during the course of the investigation and had been instigated by the undercover agent to assist in obtaining her conviction), if believed, may well have given the Court cause to reach a different result. As such, Ms. Nolan–Cooper's statements were material ones which "had a natural tendency to influence, or was capable of influencing, the decision of" the decision-making body to which it was addressed." *Kungys v. United States*, 485 U.S. at 770, 108 S.Ct. at 1546. As the statements, if true, may have had a tendency to influence the decision (i.e. whether Ms. Nolan–Cooper's due process rights were violated), of the decision-making body to which the decision was addressed (i.e. this Court), they were material.

■ Finally, to the extent the defendant means to argue that her testimony was not material to her guilt of the crime charged in the indictment, the Court finds that the materiality requirement need not relate to the ultimate issue of innocence or guilt but rather to "influence, the decision" on the specific issue before the court. *See id.* The Third Circuit has upheld an adjustment for obstruction of justice where a defendant falsely testified at trial that his confession was obtained by threats, in violation of the Fifth Amendment, even though this testimony was for the purpose of asserting his constitutional rights and not directly related to the issue of his guilt. *Bethancourt*, 65 F.3d at 1078. Therefore, examined under any of these theories, Ms. Nolan–Cooper's statements that sexual relations occurred between her and Agent Oubre in August and December, 1994 were material. The fact that Ms. Nolan–Cooper willfully made false statements about

---

**20.** In *Cuervelo*, the Second Circuit held:

> In addressing the question as to whether an indictment must be dismissed based upon outrageous governmental misconduct when a sexual relationship between a defendant and a governmental agent has been shown to exist, we believe that, at a minimum, the defendant must show: (1) that the government consciously set out to use sex as a weapon in its investigatory arsenal, or acquiesced in such a conduct for its own purposes upon learning that

> such a relationship existed; (2) that the government agent initiated a sexual relationship, or allowed it to continue to exist, to achieve governmental ends; (3) that the sexual relationship took place during or close to the period covered by the indictment and was entwined with the events charged therein.... Once those facts are found ... we can then proceed to determine whether any violation of due process standards has occurred.

> *Cuervelo*, 949 F.2d at 567.

such material matters amounts to perjury, justifying the adjustment for obstruction of justice provided by U.S.S.G. § 3C1.1.

### c. *Adjustment for Acceptance of Responsibility*

The United States Sentencing Guidelines affords a defendant who accepts responsibility two stages of downward adjustments. The initial stage, contained in U.S.S.G. § 3E1.1(a), allows for a downward adjustment of two levels when "the defendant clearly demonstrates acceptance of responsibility for [her] offense." The probation officer has recommended a downward adjustment of two levels pursuant to this initial subsection. The Court agrees with the probation officer's analysis and grants Ms. Nolan–Cooper a two level downward adjustment.

The second stage of downward adjustments is contained in U.S.S.G. § 3E1.1(b),[21] which provides an additional one level downward adjustment. The threshold requirements for this additional adjustment are that the defendant meet the qualifications for the initial adjustment, and that the adjusted offense level be sixteen or greater. Here, since Ms. Nolan–Cooper's qualified for the initial adjustment and her adjusted offense level is twenty-four, she meets the threshold requirements. The defendant must then show that she either, "(1) timely provid[ed] complete information to the government concerning [her] own involvement in the offense; or (2) timely notif[ied] authorities of [her] intention to enter a plea of guilty, thereby

permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently." U.S.S.G. § 3E1.1(b).

The probation officer did not recommend the additional one level downward adjustment under U.S.S.G. § 3E1.1(b). The defendant objects to the probation officer's failure to recommend this adjustment, contending that she met the requirements of U.S.S.G. § 3E1.1(b)(1) by giving truthful information about her culpability for the offense as early as 1995. Alternatively, she claims that she met the requirements of U.S.S.G. § 3E1.1(b)(2) by notifying the government that she intended to plead guilty prior to the government's pretrial deadline, which prevented the government from taking the case to trial and saved judicial resources.[22] The Court concludes that the defendant is not entitled to the additional one level downward adjustment under either U.S.S.G. § 3E1.1(b)(1) or (b)(2).

The Third Circuit has held the issue of "[w]hether a defendant has 'accepted responsibility' is a factual matter reviewed under a 'clearly erroneous' standard." *United States v. DeLeon–Rodriguez*, 70 F.3d 764, 767 (3d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1343, 134 L.Ed.2d 492 (1996). The "defendant bears the burden of establishing by a preponderance of the evidence that a reduction under this provision is warranted." *Id.*

The defendant contests that she never challenged her factual guilt, but rather merely asserted her constitutional right to due

---

**21.** U.S.S.G. § 3E1.1(b) provides:

> If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level **16** or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:
> (1) timely providing complete information to the government concerning his own involvement in the offense; or
> (2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently,
>
> decrease the offense by **1** additional level.

**22.** In the plea agreement, the government and defendant stipulated to a two level reduction for acceptance of responsibility. At that time, the government and defendant envisioned the plea agreement's stipulated guideline range of 41 to 51 months, which included only the two level adjustment for acceptance of responsibility.

After the presentence report's recommendation of a higher guideline range (i.e. 63 to 78 months) based on adjustments for special skill and obstruction of justice, the defendant asked the government to consider an additional one point downward adjustment. Gov't.Sent.Mem. at 5. A government review of the issue "at the supervisory level" lead the government to agree not to oppose the defendant's request for an additional downward adjustment of one level. *Id.*

process by filing a motion to dismiss for outrageous government conduct. The defendant contemplates that the reason she would not receive the additional one level downward adjustment under U.S.S.G. § 3E1.1(b) is that she filed a motion to dismiss her indictment on due process grounds. Ms. Nolan–Cooper claims that denying her a downward adjustment on such grounds would be tantamount to penalizing her for asserting her constitutional rights.

The defendant relies on Application Note 2 to U.S.S.G. § 3E1.1, which provides, in part, that even where a defendant goes to trial, she is not precluded from receiving a downward adjustment for acceptance of responsibility solely by asserting a constitutional right:

> In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.* to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

App. Note 2 to U.S.S.G. § 3E1.1.

The Third Circuit has acknowledged the applicability of Application Note 2 in *De-Leon–Rodriguez*, 70 F.3d at 767, where it observed that a defendant should not be precluded from the initial two level downward adjustment available under U.S.S.G. § 3E1.1(a) when the defendant goes to trial to preserve issues not related to factual guilt.

*Id.*[23] However, the Third Circuit has not directly addressed the issue of whether the same reasoning should apply when a court considers a one level downward adjustment pursuant to U.S.S.G. § 3E1.1(b). In *United States v. Kimple*, 27 F.3d 1409 (9th Cir.1994), the Ninth Circuit held that the district court erred when it refused the one level reduction available under § 3E1.1(b) based on the defendant's motion to suppress evidence on Fourth Amendment grounds: "a defendant's exercise of [her constitutional] rights should not in and of itself preclude a reduction for timely acceptance." *Id.* at 1413.[24] In the absence of Third Circuit precedent, the Court will, for the purposes of this hearing, assume that the defendant is not precluded from receiving the additional one level reduction for acceptance of responsibility simply because she asserted that her right to due process had been violated.

■ Nevertheless, the Court concludes that Ms. Nolan–Cooper is not entitled to the adjustment because it finds that Ms. Nolan-Cooper did not fulfill the mandate of either U.S.S.G. § 3E1.1(b)(1) (timely provided complete information to the government about her own involvement) or (b)(2) (timely notified the government of her intent to plead guilty). First, the Court notes that timeliness is a requirement explicitly set out in both U.S.S.G. § 3E1.1(b)(1) and (b)(2). In fact, the concept of "timeliness" distinguishes between the award of the initial two level downward adjustment provided by U.S.S.G. § 3E1.1(a) and the additional one level adjustment provided by U.S.S.G. § 3E1.1(b).

---

**23.** The Third Circuit concluded that the defendant in *DeLeon–Rodriguez* was not eligible for the two level downward adjustment, available under U.S.S.G. § 3E1.1(a), because he went beyond preserving issues of law and contested his factual guilt.

**24.** In light of these two cases, the defendant's reliance on *United States v. Sneed*, 814 F.Supp. 964 (D.Colo.1993), *aff'd*, 34 F.3d 1570 (10th Cir. 1994), is both unnecessary and misplaced. In *Sneed*, a defendant who had tendered a conditional offer to plead guilty, pending the outcome of his codefendants' motion to dismiss, was granted the initial downward adjustment of two levels under U.S.S.G. § 3E1.1(a) even though he went to trial. The judge concluded that the defendant was eligible for the two level adjustment because he did not minimize his factual

guilt and it was clear he only went to trial to preserve the constitutional issue. *Sneed*, 814 F.Supp. at 977–78.

*Sneed* is rendered unnecessary by *DeLeon–Rodriguez*, which sets the standard in the Third Circuit for a downward adjustment under U.S.S.G. § 3E1.1(a) where a defendant asserts a constitutional challenge to his prosecution. It is misplaced because it is based on the initial two level downward adjustment provided by U.S.S.G. § 3E1.1(a), which is not at issue in this case. *Kimple* specifically addresses the availability of the additional one level downward adjustment provided by U.S.S.G. § 3E1.1(b), and held that the adjustment is available where a defendant has challenged his prosecution solely on constitutional grounds. *Kimple*, 27 F.3d at 1413.

As was noted recently by the Ninth Circuit in *United States v. Eyler,* 67 F.3d 1386, 1390–91 (9th Cir.1995): "While the key inquiry for purposes of section [3E1.1](a) is whether the defendant has demonstrated contrition, once this has been determined, then the focus of section [3E1.1](b) inquiry is on timeliness." Indeed, Application Note 6 to U.S.S.G. § 3E1.1 observes that, as compared to conduct qualifying for the initial two level downward adjustment under U.S.S.G. § 3E1.1(a), "[i]n general, the conduct qualifying for a decrease in offense level for subsection (b)(1) or (2) will occur particularly early in the case."

■ In addressing Ms. Nolan–Cooper's claim that she is entitled to the additional one level adjustment provided by U.S.S.G. § 3E1.1(b)(1), the Court acknowledges that the defendant provided some truthful information to law enforcement authorities about the offense as early as 1995. Information provided this early would ordinarily be considered to meet the timeliness requirement if it indeed acknowledged fully the defendant's culpability. Whether, in providing this early information, Ms. Nolan–Cooper acknowledged her culpability touches on whether the information Ms. Nolan–Cooper provided the government was "complete information ... concerning [her] own involvement in the offense." *See* U.S.S.G. § 3E1.1(b)(1). The Court finds that Ms. Nolan–Cooper has failed to demonstrate that the information she provided met this standard. Instead, the Court concludes that Ms. Nolan–Cooper gave false information in order to reduce her culpability and, therefore, failed to fully acknowledge her own involvement in the offense.

The Ninth Circuit has held that where a "defendant lies about the offense conduct or 'relevant' conduct, the lies are evidence which the district court can weigh against acceptance of responsibility." *United States v. Vance,* 62 F.3d 1152, 1160 (9th Cir.1995). In distinguishing between relevant conduct and irrelevant conduct, the Ninth Circuit found that if the defendant lied about the "reason or motivation for committing a crime [it] is

[not] a dispositive factor in determining whether to grant the adjustment unless the claim was intended as a defense to liability for the charged offense." *United States v. Gonzalez,* 16 F.3d 985, 991 (9th Cir.1993). However, the *Gonzalez* court contrasted that situation to a case in which the defendant sought to avoid responsibility by claiming that he was coerced into committing the offense. *Id.* at 991 n. 3 (citing *United States v. Smith,* 905 F.2d 1296 (9th Cir.1990)). The *Gonzalez* court agreed with the *Smith* court's holding that a false claim by the defendant that he was coerced indicated that he had not accepted responsibility for his offense. *Id.*

In this case, the Court has found that Ms. Nolan–Cooper testified falsely at the pretrial hearing. It concluded that the testimony was willfully made and concerned material matters. It now concludes that the false testimony involved relevant conduct. Like *Smith,* Ms. Nolan–Cooper tried to escape responsibility by arguing that the undercover agent's sexual overtures toward her, at the very least, contributed to her criminal conduct.[25] She testified falsely that sexual encounters had taken place in August and December of 1994, a time when the conspiracy was ongoing. Her argument that Agent Oubre's conduct was a contributing factor in her decision-making calculus as to whether to engage in or continue her criminal conduct is akin to Smith's arguments that "he did not participate in the robbery of his own desire, but did so out of fear for Banks [his codefendant]." *Smith,* 905 F.2d at 1302. Therefore, a downward adjustment of one level is not appropriate under U.S.S.G. § 3E1.1(b)(1) because, by lying about relevant conduct, Ms. Nolan–Cooper did not provide timely and complete information of her involvement in the offense.

■ In considering her claim for a downward adjustment under subsection (b)(2), the Court must determine whether Ms. Nolan–Cooper "timely notified authorities of [her] intention to enter a plea of guilty." U.S.S.G. § 3E1.1(b)(2). In this case, Ms. Nolan–Cooper was indicted on September 19, 1995 and

---

**25.** Whether the agent's sexual conduct with Ms. Nolan–Cooper entitled her to a downward departure is discussed *infra* at section III.B.1.

pled not guilty at her arraignment on October 5, 1995. She did not enter a guilty plea until October 30, 1996, more than one year later. The Court weighs this delay as evidence militating against a finding that Ms. Nolan–Cooper's acceptance of responsibility was timely. The delay alone, however, does not preclude a finding of timeliness under U.S.S.G. § 3E1.1(b)(2) because, as the Fifth Circuit has observed, the term timely acceptance under this subsection is "functional, not exclusively temporal." *United States v. Williams,* 74 F.3d 654, 656 (5th Cir.1996). The Court is thus required to analyze whether Ms. Nolan–Cooper's acceptance of responsibility was functionally timely for purposes of U.S.S.G. § 3E1.1(b)(2).

The functional purpose of the additional one level downward adjustment of U.S.S.G. § 3E1.1(b)(2) is to provide an incentive for a guilty defendant to enter a guilty plea so that "(1) the government avoids needless trial preparation, and (2) the court is able to allocate its resources efficiently." *Id.* Here, Ms. Nolan–Cooper waited until five days before trial to enter her plea. On this basis alone it is difficult to imagine how her acceptance of responsibility helped the government avoid any significant amount of trial preparation. *See United States v. Wetwattana,* 94 F.3d 280, 285–86 (7th Cir.1996) (denying a one point downward adjustment under § 3E1.1(b)(2) where the defendant did not indicate his attention to plead guilty until eight months after arraignment and only five days before trial was to begin, also listing cases denying the adjustment on similar grounds); *United States v. Covarrubias,* 65 F.3d 1362, 1367–68 (7th Cir.1995) (denying a subsection (b)(2) adjustment where the defendant "did not inform the government that he would be pleading guilty in the event [his] suppression motion was denied. Had he done so, the government could have avoided preparing for his trial because the motion to suppress would have destroyed the government's case.") Moreover, had the defendant advised the Court of her desire to enter a guilty plea at an earlier stage, the Court may also have been able to schedule other proceedings on the dates it had slated for the trial. *See, e.g., Covarrubias,* 65 F.3d at 1367–68 (observing that the defendant's eleventh hour "guilty plea ... did [not] permit the district court to allocate its resources efficiently."). Therefore, the Court finds that Ms. Nolan–Cooper is not entitled to the additional one level downward adjustment provided by U.S.S.G. § 3E1.1(b)(2).

### B. *Motions for Downward Departure*

#### 1. *Government's Misconduct Takes Case Out of Heartland*

Ms. Cooper seeks a downward departure under U.S.S.G. § 5K2.0 asserting that the outrageous conduct of the government takes this case out of the heartland. *See Koon v. United States,* —— U.S. ——, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). The conduct Ms. Nolan–Cooper advances as the reason for departure is the sexual relations that occurred between Ms. Nolan–Cooper and Agent Oubre on the early morning of February 18, 1995.

The Court recounts its findings regarding the night of February 17 and morning of February 18, 1995. On the evening of February 17, 1995, Agent Oubre along with IRS Special Agent Henry Jolly,[26] were scheduled to go out to dinner with Ms. Nolan–Cooper, her friend Donita Nero and several other individuals including suspected coconspirators. The record indicated that Agent Jolly had previously expressed an in Ms. Nero, an interest that Agent Oubre passed on to Ms. Nolan–Cooper.

The afternoon of the scheduled dinner, Agent Oubre was informed by Ms. Nolan–Cooper that the other individuals expected to attend had cancelled, and that only she and Ms. Nero would attend. Agent Oubre communicated this information to his supervisors, who urged him to cancel the dinner. Agent Oubre protested, explaining that a cancellation might make Ms. Nolan–Cooper angry, and, although the investigation was nearly completed regarding her, it might endanger her role as an intermediary between

---

**26.** Agent Jolly came into the investigation in an undercover capacity several months after its inception to pose as "Tony Jones" a bodyguard and confidant to Agent Oubre.

the agent and other coconspirators who where still under investigation.

The supervisory agents allowed the dinner to go on as scheduled but required Agent Oubre and Agent Jolly to return for debriefing early in the evening, as soon as the meal was over. As directed, the two agents returned to the hotel for debriefing. After the agents' supervisors had left for the evening, the agents went out, first to a center city nightclub, and then to Quincy's, a nightclub located several miles from center city Philadelphia where the agents met Ms. Nolan–Cooper and Ms. Nero.[27]

Shortly after the agents met Ms. Nolan–Cooper and Ms. Nero at Quincy's the foursome returned to the agents' three room suite at the Four Seasons Hotel. There, the group talked and drank wine into the early morning hours of February 18, 1995. At the hearing, Ms. Nero testified that while she and Agent Jolly talked in the living room, Ms. Nolan–Cooper and Agent Oubre went into Agent Oubre's bedroom, where they stayed behind closed doors for approximately forty-five minutes. According to Ms. Nero, when Agent Oubre and Ms. Nolan–Cooper emerged from the bedroom Agent Oubre was wearing different pants. Ms. Nolan–Cooper testified that sexual relations occurred between her and Agent Oubre during this time. Agent Oubre denied this allegation.

Not long after Agent Oubre and Ms. Nolan–Cooper rejoined Agent Jolly and Ms. Nero in the living room of the suite, the women left the hotel to return to their respective homes. Ms. Nero testified that Agent Jolly arrived at her home shortly after daybreak and she had sexual relations with him at that time.[28]

The Court concluded that Agent Oubre attempted to cover up Agent Jolly's absence that morning when he talked to his superiors. He testified at the hearing that, although he had told Agent Dollard that Agent Jolly was with him at the hotel, he had not actually seen Agent Jolly. Telephone records show phone calls between Agent Oubre's cellular phone and Agent Jolly's. From this evidence, the Court found that Agent Oubre was aware that Agent Jolly was not in the room and that the reason Agent Oubre did not contact his supervisor until noon on Saturday, February 18, some ten hours after meeting Ms. Nolan–Cooper and Ms. Nero, was to have time to coordinate with Agent Jolly a cover story, before they met with their supervisors.

In considering the credibility of Agent Oubre's testimony, the Court found compelling the fact that although he has the opportunity to do so, Agent Oubre did not notify his supervisors of the purported chance meeting with the key target of an important investigation until at least ten hours after the incident, that he denied making phone calls to Agent Jolly which appeared on his phone records, and that he mislead his supervisors as to Agent Jolly's whereabouts.

Lacking an eyewitness, the Court had to resolve the conflict between Ms. Nolan–Cooper's allegation that sexual relations had occurred against Agent Oubre's flat denial. In doing so, the Court gave weight to the following factors: 1) Agent Oubre had planned the evening; 2) Agent Oubre had resisted its cancellation once it was suggested by his

27. Agent Oubre testified that there was no agreement to meet Ms. Nolan–Cooper and Ms. Nero at Quincy's. However, the circumstances of the meeting indicate it was planned. At dinner, the agents discussed with the women the possibility of meeting up with them later in the evening. The women indicated that they would go to the club Quincy's at the Adams Mark Hotel, located on City Line Avenue. Agent Oubre testified that other locations were mentioned and the last thing the women said before leaving the Four Seasons Hotel was that they were going to a friend's house. The Court concluded that it was unlikely, in the absence of an anticipated appointment with the two women, that Agent Oubre and Agent Jolly would have travelled several miles from their center city hotel to City Line Avenue, arriving there a shortly before Quincy's was scheduled to close. The Court, thus, found that Agent Oubre's testimony that the meeting with Ms. Nolan–Cooper and Ms. Nero was a chance meeting, and that he and Agent Jolly went to Quincy's because it was one of the few nightclubs in the Philadelphia area that catered to a largely African–American clientele, was not credible.

28. Agent Jolly was called as a witness by the defendant at the hearing. It was stipulated that, if asked about these events, Agent Jolly would invoke the Fifth Amendment.

supervisors; 3) Agents Oubre and Jolly had arranged to meet with Ms. Nolan–Cooper and Ms. Nero at Quincy's; 4) Agent Oubre failed to report spending several hours with a key target of the investigation to his supervisors for at least ten hours; 5) Agent Oubre misrepresented to his supervisors Agent Jolly's whereabouts; 6) Agent Oubre had a motive to fabricate based on the potential harm discovery of the incident could do to the investigation and his employment; 7) the corroborating testimony of Ms. Nero, a witness who was not impeached and who had no apparent motive to fabricate,[29] that Ms. Nolan–Cooper and Agent Oubre were alone in Agent Oubre's bedroom and that Agent Oubre had emerged from the room wearing different pants; and 8) Ms. Nolan–Cooper's strong motive to fabricate. The Court concluded that it was more likely than not that sex between Ms. Nolan–Cooper and Agent Oubre did indeed take place in the predawn hours of February 18, 1995 during the time that Agent Oubre and Ms. Nolan–Cooper were alone in Agent Oubre's bedroom in the agents' suite at the Four Seasons Hotel. Because of the circumstances of the sexual encounter, however, and as discussed above, the Court, concluded that the agents' conduct, while reprehensible,[30] did not rise to the level of a due process violation.

■ The defendant now asks the Court to regard the agent's sexual misconduct, subsequent cover up, and false testimony at the hearing on the defendant's motion to dismiss, as factors which take the case out of the heartland, justifying a downward departure. The Supreme Court has recently held that where, as here, the sentencing court encounters "a factor unmentioned in the Guidelines," the Court must, "after considering the 'structure and theory of both relevant individual guidelines and the Guideline taken as a whole, decide whether it is sufficient to

take the case out of the Guideline's heartland." *Koon*, —— U.S. at ——, 116 S.Ct. at 2045 (citation omitted). The Supreme Court admonished, however, that "[t]he court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be 'highly infrequent.'" *Id.* (citation omitted).

The defendant argues that the Court's finding that Agent Oubre's conduct did not rise to the level of a due process violation does not preclude a finding that the case falls outside the heartland. For support, the defendant cites *United States v. Egemonye*, 62 F.3d 425 (1st Cir.1995), which holds that a court may downward depart based on government misconduct which does not reach the level of a due process violation. The reasoning of this case has, in fact, been cited favorably in two recent Eastern District of Pennsylvania cases. *See United States v. Kaczmarski*, 939 F.Supp. 1176, 1181 (E.D.Pa. 1996); *United States v. Perez*, Crim.A. No. 94–0192–01, 94–0192–10, 1996 WL 502292, at *7 (E.D.Pa. Aug. 27, 1996).

■ The Court agrees that a due process violation is not necessary to take a case out of the heartland. However, as the government aptly points out, the cases cited by the defendant involved the alleged sentencing factor manipulation, and not the type of misconduct countenanced by the defendant's argument under this section. A downward departure for sentencing manipulation is rooted in a finding that the government engaged in improper conduct that has the effect of increasing the defendant's sentence. In fairness, courts see fit to remedy such a situation by reducing the sentence the number of levels that it was impermissibly increased. *See, e.g., Egemonye*, 62 F.3d at 427 (finding " 'where government agents have improperly enlarged the scope or scale of the crime,' the sentencing court has the power to

---

29. Ms. Nero, while a social acquaintance of Ms. Nolan Cooper, had no apparent motive to lie. Her testimony cast her in an unfavorable light and, if proven false, would have opened her to substantial criminal penalties.

30. The Court finds "reprehensible" that the two government agents used government funds to finance the entertainment of a target of the investigation and her friend without any apparent

investigative purpose. As discussed in the Court's findings of October 4, 1996, Hearing Tr. at 80–106, no case holds that sexual relations between an undercover agent and a target are never permissible. The Court's condemnation of the sexual relations, which the Court found occurred in this case, should not be construed as seeking to establish such a bright line.

exclude 'the tainted transaction' from the guideline computations" (quoting *United States v. Montoya*, 62 F.3d 1, 3 (1st Cir. 1995)).

Here, there is no such logical nexus. The Court has already concluded that Ms. Nolan–Cooper was not induced to commit or enlarge the crime as a result of Agent Oubre's engaging in sexual relations with her. In fact, all counts against Ms. Nolan–Cooper that stemmed from actions taken by her after the incident are to be dismissed by the government at sentencing, pursuant to the plea agreement.[31] To base a downward departure on the defendant's reasoning would result in a sentencing windfall to the defendant for no logical or policy rationale.[32]

Therefore, the Court concludes that Ms. Nolan–Cooper should be sentenced in accordance with the crime to which she has pled guilty. None of the purposes of the current sentencing scheme would be served by this departure.[33] Absent a due process violation or a showing that the government misconduct enlarged the scope or scale of a crime, and resulted in an increased sentence, a departure is not warranted.

### 2. *Sentencing Factor Manipulation*

 The defendant asserts that a downward departure is warranted because the government determined the amount of money to be laundered, not Ms. Nolan–Cooper. She claims that this "constitutes improper sentencing factor manipulation and otherwise

takes the case outside the guideline's heartland." Def.Sent.Mem. at 8.

"Sentencing manipulation occurs when the government engages in improper conduct that has the effect of increasing a defendant's sentence." *United States v. Okey*, 47 F.3d 238, 240 (7th Cir.1995), *quoted in, Kaczmarski*, 939 F.Supp. at 1180. The Third Circuit has not addressed the theory of sentencing manipulation. *See Perez*, 1996 WL 502292, at *6. Two recent Eastern District of Pennsylvania cases, while noting that the defense is not available at all in the Seventh and Eleventh Circuits, have utilized the standard set out by the First Circuit in *United States v. Egemonye*, 62 F.3d 425 (1st Cir.1995). *See, Kaczmarski*, 939 F.Supp. at 1181; *Perez*, 1996 WL 502292, at *7.

In *Egemonye*, the First Circuit held that " 'where government agents have improperly enlarged the scope or scale of the crime,' the sentencing court has the power to exclude 'the tainted transaction' from the guideline computations." *Egemonye*, 62 F.3d at 427 (quoting *United States v. Montoya*, 62 F.3d 1, 3 (1st Cir.1995)). While the First Circuit held that "something less than a constitutional violation might suffice," sentencing manipulation could not be found absent "extraordinary misconduct." *Id.* at 427. *See also Kaczmarski*, 939 F.Supp. at 1181; *Perez*, 1996 WL 502292, at *7.

In *Kaczmarski*, the defendant received stolen checks from a government informant and deposited them in bogus bank accounts opened using forged identification in the

---

**31.** Indeed, among the several charges dismissed by the government are the drug charges, which carry the stiffest penalties, including a ten year mandatory minimum. The Court recognizes that the bulk of the actions supporting these charges occurred after the government misconduct. The defendant, therefore, may already have received the benefit she seeks from the agent's misconduct by this avoidance of exposure to the severe penalties under the drug charges.

**32.** While it may be reasonable to think, indeed to expect, that the type of conduct which the Court found to have occurred in this case would ordinarily result in disciplinary action against the rogue agents, such is not for the Court to ponder. As Justice Story said in a different context comparing the allocation of responsibilities between the judiciary and the executive branches under

our tripartite system of government: "The Court has done its duty, let [the officials of the executive branch] do theirs." 2 *Life and Letters of Story* 83, *quoted in* Jean Edward Smith, *John Marshall: Definer of the Nation* at 518 & n. 182 (1996).

**33.** The purposes of sentencing are

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminals;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocation training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

name of the check recipient. Funds in the amount of the stolen checks were then intended to be withdrawn from the banks as cash. Kaczmarski was sentenced based on $104,000, the entire amount of the stolen checks.

Judge Dalzell found this amount appropriate for sentencing because the defendant intended to defraud the bank of $104,000, even though the government itself provided that specific amount in stolen checks, and the defendant only successfully cashed one check in the amount of $9,800. The court based its finding on the evidence that the defendant had encouraged the government operative to supply him with $100,000 in stolen checks, the defendant orchestrated the scheme, and the government "did not engage in 'extraordinary misconduct' or 'improperly enlarge[ ] the scope or scale of the crime.'" *Kaczmarski,* 939 F.Supp. at 1182.

In *United States v. Rusznica,* 939 F.Supp. 1183 (E.D.Pa.1996), Kaczmarski's codefendant was charged with bank fraud amounting to $18,400, the amount of the two checks he was asked to cash. However, he only successfully cashed one check for $9,800. The court held that he should only be sentenced for the amount of $9,800, even though he intended the higher amount, because that was the amount of the actual loss, and that the higher amount would overstate the offense. *Rusznica,* 939 F.Supp. at 1185 (citing U.S.S.G. § 2F1.1 Application Note 10).[34] The court reached this conclusion because the higher loss figure came from the government's operative and the defendant was only a peripheral participant who did not coordinate the scheme or approve the amounts to be taken, as other codefendants did. It is an important distinction to note that the court found that the $9,800 amount, which was set by the government, was not an unreasonable one nor was it manipulated by the government for sentencing purposes. *Id.*

Unlike Rusznica, Ms. Nolan–Cooper did not merely have the intention of laundering

over $100,000 in purported drug proceeds, she was responsible for actually laundering over $190,000. She was also not a peripheral participant, she was the orchestrator of the money laundering conspiracy. She is arguably more like Kaczmarski, who had the intention of laundering far more of the purported drug proceeds. But unlike Kaczmarski, she is not being charged with any funds beyond those that were actually laundered.

In *Egemonye,* the defendant was targeted in a sting operation. He purchased stolen credit cards from an undercover state trooper, forged identification documents and obtained cash advances on the cards from banks. The case involved four stolen credit card purchases. The first three transactions involved three or four credit cards with aggregate credit limits of $7,450 to $21,000 for each transaction. The final transaction included forty credit cards with an aggregate limit of over $200,000. *Egemonye,* 62 F.3d at 426. At sentencing, the defendant was sentenced based on a loss of $242,950. The defendant appealed, claiming that the final transaction was sentencing factor manipulation to increase his sentence. *Id.* at 427. The First Circuit upheld the sentence, concluding that no extraordinary misconduct took place despite the fact that the last transaction involved a sizeable jump, and finding "the sting operation involved no pressure whatever on the Egemonye, lasted for only four transactions, and garnered several other defendants." *Id.* at 428.

Following the rationale in *Egemonye,* there is no evidence that the undercover agent pressured Ms. Nolan–Cooper to engage in the money laundering, or influenced her to launder more money than she was ordinarily willing to launder. Indeed, from the first meeting with the undercover agent she was a willing participant in the money laundering scheme and readily acknowledged that it would involve a significant amount of money to be laundered over an extended period of time. Additionally, the government, had a legitimate law enforcement pur-

---

**34.** Application Note 10 to U.S.S.G. § 2F1.1 provides in pertinent part: "In a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense. This may occur, for example, where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one would consider honoring it. In such cases, a downward departure may be warranted."

pose in continuing the money laundering operation, i.e. identifying and rooting out more coconspirators. The Court concludes that this thirteen month investigation which involved the laundering of nearly $200,000 was neither extended nor expanded for improper purposes and, therefore, the government did not engage in conduct even approaching the "extraordinary misconduct" required to show sentence factor manipulation.

## IV. CONCLUSION

The Court finds that Ms. Nolan–Cooper used special skills in the offense and obstructed justice and, therefore, overrules the defendant's objections to the PSI report's recommendation for upward adjustments based on those grounds. The Court finds that Ms. Nolan–Cooper is not entitled to an additional downward adjustment of one level for acceptance of responsibility and, therefore, overrules the defendant's objection to the· PSI report's failure to recommend such an adjustment.[35] Finally, the Court denies the defendant's motion for a downward departure, finding that the conduct of the government did not take this case out of the Guideline's heartland, and the government did not engage in sentencing factor manipulation.

---

**35.** All other objections to the text of the PSI report have been considered and are also over- ruled.